[Civil No. 3100.  Filed May 5, 1932.]

[10 Pac. (2d) 958.]

CALIFORNIA STATE LIFE INSURANCE COMPANY, a Corporation, Appellant, v. MARY G. FUQUA and R. H. FUQUA, Her Husband, Appellees.

Messrs. Armstrong, Kramer, Morrison & Roche (Mr. C. E. McLaughlin and Mr. Porter McLaughlin, of Counsel), for Appellant.

Mr. L. M. Laney and Mr. George T. Wilson, for Appellees.

LOCKWOOD, J.—Mary G. Fuqua and R. H. Fuqua, her husband, hereinafter called plaintiffs, brought suit against California State Life Insurance Company, a corporation, hereinafter called defendant, to recover the sum of $5,000 alleged by plaintiffs to be due from defendant on an insurance policy written by it upon the life of one Francis Fuqua. The case was tried to a jury, which returned a verdict in favor of plaintiffs for the full amount prayed for, and defendant has brought the matter before us for review.

Up to a certain point the parties are agreed as to the facts necessary for a determination of the case, and we state these agreed facts as follows: The policy in question was for the sum of $2,500, but it contained a rider to the effect that, if the insured should die as a result of bodily injury effected solely through "external, violent and accidental means," defendant would pay double the face of the policy. It was further provided, however, that the double indemnity should not apply if death resulted "from any violation of law."

Some time after midnight on January 23, 1930, the deceased Francis Fuqua appeared at No. 1923 West Adams Street, premises occupied by one Jack McClain, who was then engaged in bootlegging. Fuqua became quite boisterous while there, brandishing a revolver and telling McClain that he was a "tough guy." He engaged in an altercation with a friend of McClain's, one Worley, placed the revolver against the latter's body, and pulled the trigger; but fortunately the shell missed fire and failed to explode. McClain and Worley then decided that the situation was becoming entirely too strenuous to suit them, and left the house in a half-dressed condition, proceeding to a café on the corner of Seventeenth Avenue and Washington Street, where they met two city policemen named Rader and Smith. They related these things to the officers, and the latter got in a Ford touring car used by them for patrol purposes and drove out to the 1900 block on West Adams Street to investigate the matter.

So far there is practically no dispute as to the occurrences leading up to Fuqua's death, but from here on there is a sharp conflict in the deductions drawn from the evidence by plaintiffs and defendant. Rader and Smith testified that they passed the McClain premises going eastward to a point three or four houses beyond, when they saw a man, who later proved to be Fuqua, step into the street holding a pistol in his right hand. The man signaled to them to stop, and they drove up until within a few feet of him. At approximately the time the car stopped they ordered Fuqua to "stick them up." Immediately upon these words being spoken, Fuqua, who was still holding the pistol in his right hand, opened fire on them at such a short range as to scorch Smith's nose and singe Rader's hair. They returned his fire immediately and he ran to the rear of the car and again fired, the bullet going into the car and

lodging in the rear cushion. The officers continued firing at Fuqua, who dropped his gun and ran a few feet to a driveway on the opposite side of the street where he fell dead. They further testified that a street light near there gave so bright an illumination that when they ordered Fuqua to "stick them up" he must have seen that they were in uniform with their badges on, and known that they were officers. They admitted, however, that they did not specifically notify him that they were police, or that they were arresting him. Fuqua being dead, they are the only living eye-witnesses of what actually happened at the immediate time of the killing, but other officers who were summoned later corroborated their testimony to the extent of stating that they saw a hole in the rear of the police car made by a bullet from the outside, and found the rear cushion on fire from the bullet.

The evidence on behalf of plaintiffs as to what happened at the time of the shooting was necessarily circumstantial. Three witnesses testified that Fuqua had always been left-handed. Two witnesses testified that the pistol which Fuqua had with him that night had been given him a few hours before the killing, and that there were only three cartridges accompanying it. One witness said that Fuqua had fired two of these before the arrival of the officers on the scene, and snapped the third without exploding it, and had then asked for a taxicab. The uncontradicted evidence is that when Fuqua's gun was taken possession of by the officers who arrived shortly after the shooting, there were two exploded cartridges and one which was unexploded, but showed the mark of the firing pin.

It is the theory of the defendant that Fuqua was killed in an attempt to resist forcibly an arrest by officers who had reasonable cause to believe that he had just committed a felony by attempting to shoot

Worley, and that the double indemnity does not apply because his death was the natural and proximate result of his violation of law in thus resisting arrest. It is the theory of plaintiffs that, whatever Fuqua's conduct was before the officers arrived, at that time he was peaceably signaling what he believed to be a taxicab which he had asked McClain to get for him, and that the officers, without any justification or excuse, immediately opened fire upon and killed him, and that he did not fire a shot at this time, or attempt in any manner to resist arrest.

There are some six assignments of error which we will consider in the order which seems advisable. The fourth is that the evidence shows conclusively the deceased came to his death as the direct and proximate result of a violation of law. If the testimony of the officers Rader and Smith is true *in toto,* there is no doubt that the court should have instructed the jury to return a verdict in favor of defendant, because, if they are to be believed, he did come to his death as a result of a violation of law. If, however, the theory of the plaintiffs is correct, the killing was either wanton on the part of the officers or else an unfortunate mistake. It is the invariable rule of this court, never departed from since its organization, that, where the evidence is of such a nature that reasonable men could form different opinions as to the inferences of ultimate facts to be drawn, we will not disturb the findings of the trial court or the verdict of the jury on the ground that in our opinion they did not reach the proper conclusion as to those facts. The officers testified positively and repeatedly that Fuqua held the pistol in his right hand when he stopped them, and that he fired while it was still in that hand. Three witnesses on the other hand testified that he had always been left-handed. Rader and Smith testified to two shots being fired by Fuqua; one before they opened fire, and one during the course

of the mêlée. The plaintiffs offered evidence from which, if true, the inference could reasonably be drawn that Fuqua never had more than three cartridges in his possession during the evening, and that two of these had been fired and the third snapped before the officers arrived at the scene of action. There was also a question as to whether Fuqua knew that Rader and Smith were officers. Such being the state of the evidence, we cannot say affirmatively that a reasonable man might not have drawn the inference therefrom that the officers' account of the killing was not in accord with the true facts, and therefore have declined to believe them when they said that Fuqua opened fire upon them before there was any hostile demonstration on their part, or knowingly attempted to resist an arrest in any manner.

The defense of death as a result of a violation of law is an affirmative one, and the burden of proof is on defendant to show that Fuqua's death was caused in that manner just as the burden is upon plaintiffs to show that it was accidental in its nature. If the testimony of the officers is disregarded, there is no evidence to sustain defendant's position. The fourth assignment of error is not well taken.

The third assignment of error is based upon the theory that the evidence shows conclusively that Fuqua's death did not result from "accidental" means. Let us then determine the meaning of the word "accidental," as used in insurance policies of this nature.

Defendant claims, and supports its claim by many authorities, that "an effect which is the natural and probable consequence of an act or course of action cannot be said to be produced by accidental means." Giving the language of this definition its ordinary meaning, it cannot be held true, for it is, taken literally, a denial of the possibility of an "accident," unless we assume that the attack recently made by

some theorists upon the law of cause and effect has been successful. All effects are the natural, probable and indeed inevitable consequences of definite acts or courses of action, or we must abandon our entire present system of epistemology. The so-called "accident" is as much the inevitable consequence of one specific act or course of action as is a mathematical conclusion the inevitable result of certain premises.

If the cases supporting defendant's definition are analyzed carefully, it will be found that what they really mean is that an effect which was or should have been reasonably anticipated by an insured person to be the natural or probable result of his own voluntary acts is not accidental. Or to put it in the affirmative form, if the result is one which in the ordinary course of affairs would not be anticipated by a reasonable person to flow from his own acts, it is accidental. The test is, what effect should the insured, as a reasonable man, expect from his own actions under the circumstances. Let us apply this test to the evidence.

It is undisputed that Fuqua's death was caused by a gunshot wound. Of course, there is no question that a death from this cause is from external and violent means, and, in view of the legal presumption against suicide, we think that when a plaintiff in a case of this nature has proved that the death of the insured is the result of a gunshot wound, he has made a *prima facie* case of death from "external, violent and accidental means." Indeed we understand that defendant does not dispute this as a general principle. Its claim is, however, to use its own language, "that he (Fuqua) was courting death for several hours prior to the unhappy incident on West Adams Street, when the police officers were forced, for their own protection, to kill him." For the purpose of the argument, we may agree with defendant that, if either McClain or Worley had killed Fuqua while he

was in the McClain house just before they left, it might be said that his death was the natural, direct and to be anticipated effect of his own voluntary acts, and that a coroner's jury might well have returned the old western verdict that "deceased came to his death by calling Bill Jones a liar"; but the evidence shows clearly that the hostile demonstrations against McClain and Worley had ceased when they left the house, and, even if the story of the officers be taken as true, there is no causal connection between the assault on Worley and the killing.

This court has held in the case of *Jordan* v. *Logia Suprema, etc.*, 23 Ariz. 584, 24 A. L. R. 974, 206 Pac. 162, that, in order to bring a case within an exception in an insurance policy such as that relied upon in the present case, there must be causative connection between the acts which constitute the violation of law and the death of the insured, and, while such holding was perhaps *dicta* under the circumstances of the particular case, it is undoubtedly the law. In that case the insured had committed a burglary and was escaping from the house, and, in a struggle with the owner of the premises, was killed by the accidental discharge of his own gun, and we held that the proximate cause of his death was not the burglary, but the accidental discharge of the gun after the commission of the crime while he was endeavoring to escape. If this be so, much more should we say that Fuqua's conduct in the McClain house could have had no direct or proximate connection with his shooting by the officers some time thereafter. We are of the opinion that if the jury disbelieved the testimony of the officers as to the alleged attempt to arrest and the resistance thereof by Fuqua they would be justified in finding that plaintiffs had made a *prima facie* case that Fuqua had died as the result of external, violent and accidental means, and that defendant had not conclusively refuted it.

The second assignment of error is that the court refused to admit evidence of Fuqua's earlier conviction of burglary and his twice violating a parole, and that such burglary was the same as one of which his friend Jackson, who testified during the trial, was also convicted. It is urged that this evidence was admissible on two grounds: First, as showing the interest and bias of the witness Jackson; and, second, as throwing light upon who was the aggressor at the time of the killing. So far as the first point is concerned, Jackson admitted that he was a friend of Fuqua, and also admitted that he had previously pleaded guilty to a felony. We can see nothing which could have been added to these admissions by the record of Fuqua's connection with Jackson in the former burglary. The second point is more difficult to determine. It is, of course, the general rule that previous crimes committed by a party are not admissible in evidence against him in either a criminal or civil case, as it would lead to the raising of many collateral matters which would divert the minds of the jury from the main issue in the case. *Dorsey* v. *State,* 25 Ariz. 139, 213 Pac. 1011.

It is true, however, that the trend of the more recent decisions appears to be in the direction of allowing evidence of particular acts of violence and turbulence and certain classes of crimes committed by a party to be offered in evidence when one of the issues of the case is, Who was the aggressor in an affray which results in a homicide? *Mendez* v. *State,* 27 Ariz. 82, 229 Pac. 1032. If, therefore, Fuqua's previous conviction of burglary can reasonably be said to throw light on the question of who was the aggressor at the time of his death, the trial court should have admitted it. If not, it correctly excluded it. If the conviction had been of a crime which would reasonably tend to show that Fuqua was a man of violent and turbulent character, we think it

would have been admissible. The offense, however, was that of a daytime burglary. Such a crime would have no bearing upon the question of who was the aggressor in the case at bar, unless it was shown that the circumstances of the burglary indicated that Fuqua was a violent character and inclined to resort to the use of firearms. This does not appear in the record of conviction or in the offer of proof made by the defendant. Evidence of this nature would have, of course, been highly prejudicial before the jury, and while that would have made no difference as a matter of law, if the evidence was entitled to admission, the court should guard with particular care against evidence of this nature, unless it is clearly proper. We are of the opinion that the court did not err in excluding it.

The fifth assignment of error is that the court improperly stated the law in the following instruction:

"If the shooting of Francis· Fuqua was an unexpected and unusual result and a result which could not have been reasonably anticipated from his previous acts and which he did not intend to produce and was not a natural or probable consequence of his acts, then his death was caused by accidental means within the meaning of the insurance policy."

It is contended this means that, although an effect might be the natural and direct result of his voluntary acts, nevertheless, if the result was unexpected or unusual, it would be accidental.

We do not so construe the instruction. The court, in effect, told the jury that in order to find the death accidental it must find four elements in the conjunctive and not in the disjunctive, to wit: (a) The shooting must have been unexpected and unusual; (b) it could not have been reasonably anticipated to be the result of his acts; (c) he did not intend to produce it; and (d) it was not a natural or probable

consequence of his acts. Had these elements been stated in the disjunctive, the instruction would have, of course, been error; but stated as they were, in the conjunctive, we think the instruction favored the defendant as placing a greater burden upon plaintiffs than the law required, for, as we have shown, an accident, like every other event, is the natural and inevitable result of all the antecedent acts affecting it. Certainly, if all four of the elements mentioned appeared in the evidence, the death was accidental.

The sixth assignment of error is that the court misstated the law in the following instruction:

"I further instruct you, however, that if you find from the evidence that the officers were mistaken in their belief that Francis Fuqua was endeavoring to shoot them or inflict any serious bodily injury upon them, and that Francis Fuqua in truth was' not endeavoring to shoot or inflict any bodily injury upon the officers in question, and that the shooting of Francis Fuqua was not in fact the immediate and proximate result of any violation of law by him, then the shooting of Francis Fuqua was accidental within the meaning of that term as used in the insurance policy, and the plaintiff would be entitled to recover under the double indemnity rider attached to the policy."

It is urged that the instruction does not properly state the law of self-defense as applicable to this case, and it is claimed that if a man acts honestly in the face of apparent danger, even though he is mistaken, if the action is that of a reasonable man under the circumstances he is justified as a matter of law in slaying his apparent assailant. Defendant evidently misapprehends the issue involved. It is not whether the officers acted in self-defense, but whether Fuqua was actually violating the law. Even though the officers might have been justified in the circumstances as they appeared to them in acting in self-defense, that does not necessarily imply that Fuqua was en-

gaged in the commission of a crime. The test for that issue in this case is not what the officers reasonably believed him to be doing, but what he actually was doing, and we think it is going entirely too far to hold that, merely because the killers made an honest mistake as to the necessity of slaying, the death of the insured could not be the result of external, violent, and accidental means.

This brings us to the last and most difficult question in the case. Defendant offered in evidence a certified copy of the death certificate of Fuqua, signed by the coroner, which was rejected by the trial court. This certificate was on the usual standard form issued by the Arizona state board of health, and, in answer to the question as to "the principal cause of death and related causes of importance," the coroner had inserted the phrase "gunshot wounds inflicted by officers Rader and Smith in the performance of their duties."

Section 2730, Revised Code of 1928, provides that:

"The coroner shall state in such certificate the name of the disease causing death, or if from external causes, the means of death; and whether appearing accidental, suicidal, or homicidal; and such information as may be required by the state registrar."

And section 2740, Revised Code of 1928, reads, in part, as follows:

"The state registrar shall, upon request, supply to any applicant a certified copy of the record of any birth or death, for the making and certification of which he shall charge a fee of fifty cents. Any such copy of the record of a birth or death, when properly certified by the registrar, shall be *prima facie* evidence of the facts therein stated."

It is contended by defendant that, under these two sections of the Code, the certificate was admissible and established *prima facie* that Fuqua came to his death as the result of gunshot wounds in-

flicted by officers in the discharge of their duty. There is quite a conflict of authority in regard to the admissibility and effect of certificates of this kind. The courts of New York and Indiana apparently hold that they are only admissible in cases of a public nature, and not in actions between private parties. *Brotherhood, etc.,* v. *Barton et al.,* 46 Ind. App. 160, 92 N. E. 64; *Beglin* v. *Metropolitan Life Ins. Co.,* 173 N. Y. 374, 66 N. E. 102.

On the other hand, it has been held in Massachusetts, Pennsylvania and Minnesota, on statutes very much like ours that they are admissible in all proper cases, and are *prima facie* evidence of the facts therein stated. *Shamlian* v. *Equitable Accident Co.,* 226 Mass. 67, 115 N. E. 46; *Broadbent's Case,* 240 Mass. 449, 134 N. E. 632; *Jensen* v. *Continental Life Ins. Co.,* (C. C. A.) 28 Fed. (2d) 545; *In re Olson,* 176 Minn. 360, 223 N. W. 677.

In the case of *Security Benefit Assn.* v. *Small,* 34 Ariz. 458, 272 Pac. 647, a death certificate was offered in evidence, which gave the cause of death as tuberculosis, and the duration of the disease as four years. One of the vital points in the case was the length of time the decedent had suffered from tuberculosis. While it is true no objection was made to its admission in that case, we assumed that it was *prima facie* evidence not only as to the cause of death, but as to the duration of the disease.

We are of the opinion, under the peculiar provisions of our statute, and a logical interpretation thereof, that a coroner's certificate made in accordance with section 2730, *supra,* is admissible in court as *prima facie* evidence "of the facts therein stated." Plaintiffs urge, however, even admitting this to be true, the statement in the certificate that the gunshot wound which caused the death of Fuqua was "inflicted by officers Rader and Smith in the performance of their duty" is not a fact, but merely the opinion of the

coroner's jury and therefore not admissible under the statute.

A similar question was before the Supreme Court of Minnesota in *Backstrom* v. *New York Life Ins. Co.*, 183 Minn. 384, 236 N. W. 708, and it held, with one judge dissenting, that, while the statute made the "facts" stated in the certificate *prima facie* evidence, the mere opinion of the coroner's jury as to how those facts arose was hearsay and not admissible.

There is no doubt that the legislature may, if it desires, change the rules of evidence. The statute in question expressly directs the coroner to state, whether the death appears accidental, suicidal, or homicidal. Unless this opinion of the coroner's jury is to be considered as a "fact" and used in evidence, it is absurd for the legislature to require it to be inserted in the certificate, for it would be purposeless. We therefore hold that the clause in regard to how the gunshot wound was inflicted should have been admitted in evidence with the rest of the certificate, as *prima facie* evidence not merely that the death was caused by a gunshot wound, but as to why and how the wound was inflicted. *Jensen* v. *Continental Life Ins. Co., supra.*

But while it was error for the court to refuse to admit the coroner's certificate of death, we think the case should not be reversed for that reason. All of the witnesses who could have given any testimony supporting the conclusion reached by the coroner's jury testified fully in the trial of the case at bar. The death certificate merely stated the opinion of the coroner's jury based on the testimony of those witnesses. The trial jury having before it the same evidence, and perhaps some which was not available at the inquest, came to a different conclusion. Since the death certificate was merely *prima facie* and not conclusive evidence as to the cause of death, the jury herein had the right to take a different view on that

point from the evidence presented to it, and the certificate could not reasonably be expected to have changed the result. This is a proper case for the application of article 6, section 22, of the Constitution.

This disposes of all the questions raised on the appeal which it is necessary for us to refer to.

The judgment of the superior court of Maricopa county is affirmed.

McALISTER, C. J., and ROSS, J., concur.