7 So.2d 29
### CONTINENTAL CASUALTY CO. v. MEADOWS.
#### 6 Div. 794.

Supreme Court of Alabama.
March 19, 1942.

London & Yancey, Geo. W. Yancey, and Fred C. Koenig, Sr., all of Birmingham, for appellant.

478

Taylor & Higgins and Waldrop Windham, all of Birmingham, for appellee.

GARDNER, Chief Justice.

Plaintiff was the named beneficiary in a health and accident insurance policy issued by defendant company to her husband, Richard C. Meadows, and insuring against loss of life resulting from bodily injuries, effected solely through accidental means. The insured, Richard C. Meadows, did, on April 28, 1939, and while this policy was in force, receive bodily injuries (gun shot wounds), which resulted in his death. The defendant company declined to pay the loss, hence this suit, resulting in a judgment for the plaintiff, from which defendant appeals.

Plaintiff, after offering in evidence the policy of insurance, produced proof that the insured died as a result of external and violent means, and no more, and thus made out her prima facie case for recovery. Inter-Ocean Casualty Co. v. Foster, 226 Ala. 348, 147 So. 127.

The following facts were then developed by the testimony of witnesses offered by defendant. Near noon of April 28, 1939, Meadows and one Payne went to a hotel in Birmingham and secured adjoining rooms.

There is much detail of proof as to the two women who met these men at the hotel where they remained that afternoon. It is clear a Mrs. Carter was Meadows' companion and that she and Meadows secured another married woman as Payne's "date". Payne testifies Meadows drank heavily that afternoon, and we are persuaded subsequent events fully corroborate his statement. Payne later in the afternoon carried both the women home in his car. When Payne was leaving the hotel, Meadows was across the bed and asked Payne "if he had lost my friendship", to use the language of the witness.

Meadows and Mrs. Carter had finally engaged in much quarrelling. About seven o'clock the same afternoon, and before dark, the husband of Mrs. Carter reached their apartment, and he states his wife and fifteen year old son were then at home. The telephone rang twice, but Carter did not hear any of the first conversation. But he answered the second call and a man's voice asked to speak to Junior. Carter told his wife to answer it, and listened to the conversation through an extension telephone in another room. He heard the same male voice say: "Honey, what made you do me that way", to which she responded she did not want to talk to him, that her "husband was at home". The voice answered "he was coming over there, if she did not meet him downstairs". She told him not to come. In a short time thereafter a man appeared at the apartment. The boy was away at that time, but Carter and his wife were there. The man who so appeared was Meadows, the insured. He did not knock on the door, but "just walked on in the door", and into the living room. Carter was seated and a pistol on the mantel was some five or six steps away.

Meadows asked for Payne and Carter told him no such person lived there, but he replied he knew "damn well there was". Carter insisted there was a mistake and asked Meadows to leave, that he was in the wrong place and best thing to do was to get out, pushing him out of the door. Carter closed the door, but had no key and tried to hold the door with his foot as Meadows made effort to re-enter. Carter reached and got the pistol and when Meadows entered the second time Carter had the gun in his hand. Carter again told him he was in the wrong place and to get out, to which he replied he knew " * * * well he was in the right place", that "Payne is here and I am going to find him or tear up the * * * Joint". Carter testifies that Meadows then started towards him and he "shot down at the floor to scare him off", and that when Meadows appeared to "grab the gun" he switched hands with the gun, grappled with him and "pulled loose from him".

Carter further states that after he shot in the floor Meadows turned around "as though reaching for a gun," and with an oath and vile epithet said "I am going to get you" and that when this was said he, Carter, jumped behind the door "and started to shoot where he last saw Meadows standing". Carter insists all of the time Meadows had not walked out of the apartment "but was a little bit further in the door—further in the room".

The body of Meadows was next seen at the landing leading to Carter's apartment, some seventeen steps below. There were three bullet holes in his back and the course of the bullets was downwards. Carter further testifies that when he fired the first shot into the floor Meadows was "partly facing him and then he partly turned his side", and that the other times he shot he fired where he had last seen Meadows standing, but without seeing him. He, Carter, was "over behind the door". The last time he saw him after firing in the floor to frighten him, was when he "looked down and saw his body laying at the foot of those 17 steps".

When the officer reached the body of Meadows he had evidently been dead several minutes. Exactly the length of time no one states. No weapon was found on the body and the officer says he detected no odor of whisky. But he further states that you get the "odor of liquor from a man's clothes or from his breath because he is breathing, you smell it when he breathes". Viewed in the light of these statements we do not think that the negative testimony of the officer to the effect he detected no odor of liquor on the body of Meadows can be considered as contradictory of the positive testimony of Payne as above outlined, which clearly discloses a condition of intoxication on Meadows part. Nor do we find anything unreasonable in Payne's statement. That it was an afternoon of debauchery is plain enough and intoxicating liquor played its part. Payne himself did not drink, so he says, and counsel brands this statement as false and absurd. There is nothing in this record to indicate to the

contrary and the matter of drink was a mere incident. Nor would Payne disclose the name of his companion, and it is evident that if he in fact knew her name he feared for his life if so disclosed. He was then unmarried, though married at the time of trial.

But considering all of the proof we are persuaded the conclusion is unescapable that Mcadows was in fact intoxicated when he went to the Carter apartment over the protest of Mrs. Carter who had informed him her husband was at home.

One of the conditions in the policy here sued upon was that it did not cover loss "if injury is sustained while the insured is under the influence of any intoxicant". This was one of the issues in the case, and here argued by appellant as one of the reasons defendant was due the affirmative charge with hypothesis, as duly requested.

In discussing a like provision in an insurance policy this Court in Standard Life & Accident Ins. Co. v. Jones, 94 Ala. 434, 10 So. 530, 532, observed:

"But the phrase, 'under the influence of intoxicating drinks,' as used in policies of this character and in this connection, has a legal significance, differing from the popular one, and implying such influence as in reality amounts to intoxication. In a well-considered case it was said by the supreme court of New York that 'to be "under the influence of intoxicating liquors," within the meaning of this policy, the insured must have drunk enough to disturb the action of the physical or mental faculties, so that they are no longer in their natural or normal condition.' When, therefore, the defendant imposed upon persons insured by it the condition that it would not be liable when death or injury should happen while the insured was under the influence of liquor, the intention manifestly was to require the insured to limit its use in such a degree as that he retained full control over his faculties of mind and body. While he did so, the company was reasonably secure against the insured exposing himself unnecessarily to dangers from his own acts or the acts of others, produced 'by his own irritating or offensive conduct or language,' or, we may add, as applicable to the present case, produced by his failure or inability to conserve his own safety consequent upon the influence exerted by the liquor to the impairment of his faculties. Shader v. [Railway Pass.] Assurance Co., 5 Bigelow, Ins.Cas. 331; [Id., 3 Hun 424], 5 Thomp.

& C. 643. It is clear that giving to the words, 'under the influence of intoxicating drinks,' the meaning accorded them by the case quoted from, and which we think is eminently sound, they import nothing more or less than intoxication, and hence that there is no inconsistency, from the point of view of the law, between the application and the policy itself, in this respect; they each and both rest the exception in question upon the intoxication of the insured at the time of the accident."

This authority likewise holds, that under such a policy stipulation the insurance company is under no duty to show a causal connection between the condition of the insured and the catastrophe. But we think the proof not only shows the intoxicated condition of Meadows but a causal connection between such condition and the fatal shooting.

Payne bought the whisky and gave it to Meadows, the latter drinking heavily that afternoon, and while across the bed saying something to Payne as he left the hotel about losing his friendship.

Shortly thereafter we find Meadows talking over the telephone with his woman companion, insisting on coming to her home, though told of the husband's presence, and in fact going to the apartment and entering unannounced. No normal man would have thought for a moment of courting death in such a reckless manner. Meadows' every act fully corroborates Payne and we think the only reasonable inference to be reached from a consideration of all the proof is that Meadows had attained that degree of intoxication discussed in the Jones case, supra, and that the affirmative charge was due upon this theory of the defense.

But there is still another theory leading to a like result and concerning which we conclude there is no reasonable ground for debate. This defense rests upon the policy provision that it does not cover loss "if the injury causing the loss results from the intentional act of the insured or any other person", with exceptions not here pertinent. Speaking of such a defense in suits of this character, we said in National Life & Accident Ins. Co. v. Hannon, 214 Ala. 663, 108 So. 575, 576:

"The provision of the policy exempting the company from liability for injuries intentionally inflicted by himself or by any other person is valid and binding. Such

was the holding of this court in Orr v. Travelers' Ins. Co., 120 Ala. 647, 24 So. 997 (cited approvingly in Continental Casualty Co. v. Cunningham, 188 Ala. 159, 66 So. 41, L.R.A.1915A, 538), and recognized by the authorities generally".

The testimony is to the effect "there were three bullets that were shot in the back", and one bullet through the bone of the right leg. Four bullets in all found their mark. That Carter intentionally shot Meadows is clear enough, and no reasonable inference to the contrary can be drawn from this proof.

As remarked in Orr v. Travelers' Ins. Co. supra [120 Ala. 647, 24 So. 999], and applicable here "there is, in the fatal result of the shot, strong evidence of a careful aim". To the one shot in the Orr case there are here added three additional shots all reaching their mark. Indeed we do not find counsel for plaintiff in their brief placing any great stress upon the question of proof in this respect. Their argument is largely directed to the contention the insurance policy is to be construed, in regard to this feature, as applicable only to injury and not to a fatal encounter as here disclosed. We are cited to Kentucky Central Life & Accident Ins. Co. v. Harper, 230 Ky. 341, 19 S.W.2d 973, which is largely rested upon Interstate Business Men's Accident Ass'n v. Dunn, 178 Ky. 193, 198 S.W. 727, 6 A.L.R. 1333, which latter authority was noted and differentiated by this Court in National Life & Accident Ins. Co. v. Hannon, 214 Ala. 663, 108 So. 575. Counsel for plaintiff also cites Cooper v. National Life Ins. Co., 212 Mo.App. 266, 253 S.W. 465, 467. Our examination of these authorities is not persuasive.

■ As we read the Cooper case, supra, the holding is the exception is not to be applied to an act only "in part intentional". As to the Harper case, supra, we think, as in the Dunn case, supra, there is some difference as to the language of the policies involved. In any event we have carefully considered the language of this policy as considered and discussed by the Supreme Court of Tennessee in Maclin v. Continental Casualty Co., 172 Tenn. 244, 111 S.W. 2d 1019, wherein the holding was "that the 'loss' excepted from the coverage of the policy has application to both fatal and nonfatal injuries". The logic of that opinion, is, in our opinion unanswerable, and a contrary construction of the policy contract would be strained and unnatural. The Tennessee Court was dealing with the policy contract here involved and we adopt the opinion of that Court upon this matter of construction as our own and forego further discussion.

■ Nor did the trial judge construe the policy in line with plaintiff's argument. The court considered a jury question was presented. But in his instructions to the jury he appears to have laid some stress upon the question as to whether or not when Carter fired the shots he was of sound mind. If Carter was insane this would have been an answer to this particular defense. Continental Casualty Co. v. Cunningham, supra. See, also, 56 A.L.R. 686, 689. And speaking to this question, this Court in National Life & Accident Ins. Co. v. Hannon, 212 Ala. 184, 101 So. 892, 894, said:

"The rule is that in order to render an injury unintentional and accidental under policies of accident insurance by reason of the insanity of the person who inflicted the injury, there must be such a diseased and deranged condition of the mind as to render the person incapable of distinguishing right from wrong in relation to the particular act with which he is charged."

■■ In the instant case it is to be presumed that Carter was of normal and sound mind, and we fail to find in this record any indication to the contrary. He no doubt felt more or less outraged at Meadows' conduct and may have suspected he was the man who had previously conversed with his wife over the telephone and had his suspicion aroused, though there is nothing to show he then had knowledge of what had occurred that afternoon at the hotel. And he was no doubt excited. But there is nothing here to indicate more, nothing upon which the jury could conclude there was any "diseased and deranged condition of the mind".

We, therefore, conclude defendant was likewise due the affirmative charge upon this theory of defense. Defendant argues strenuously the insured's death was not accidental as he was undisputedly the aggressor and voluntarily put his life at stake and deliberately took the chances of a fatal result, though he may not have known at the time that Carter was armed. O'Bar v. Southern Life & Health Ins. Co., 232 Ala. 459, 168 So. 580. Plaintiff answers by the argument, that, though Meadows may have been the aggressor, yet the jury could rea-

sonably infer from the location of his body, the bullet wounds in his back and their downward course, that he had in good faith retreated and was on his way out when fired upon, citing as to the legal proposition involved the cases of Ben-Hur Life Ass'n v. Cox, 95 Ind.App. 166, 181 N.E. 528 and .California State Life Ins. Co. v. Fuqua et al., 40 Ariz. 148, 10 P.2d 958.

But as the two questions hereinabove discussed are decisive of the case favorably to defendant, no necessity arises for a consideration of this theory of defense and it is left to one side and undetermined.

For the reasons stated herein we are of the opinion the affirmative charge requested by defendant should have been given and that the judgment rendered is due to be reversed  It is so ordered.

Reversed and remanded.

BOULDIN, FOSTER, and LIVINGSTON, JJ., concur.