428 P.2d 137

**Bernice M. KNIGHT, Appellant,**

v.

**METROPOLITAN LIFE INSURANCE COM-PANY, Inc., Appellee.**

**No. 2 CA–CIV 238.**

Court of Appeals of Arizona.

May 19, 1967.

Rehearing Denied June 30, 1967.

Review Granted Sept. 26, 1967.

Wilford R. Richardson, Safford, for appellant.

Kramer, Roche, Burch, Streich & Cracchiolo, by William P. French, Phoenix, for appellee.

MOLLOY, Judge.

This is an appeal from a judgment finding no liability under a life insurance policy. Appellant, Bernice M. Knight, is the mother of Jackie E. Knight, a single man, who was killed on June 28, 1964, in Gila County, Arizona, as a result of a dive from the top of Coolidge Dam.

The case was tried by the court, sitting without a jury, and the court made findings of fact and conclusions of law as follows:

"FINDINGS OF FACT

"1. Jackie E. Knight, an adult male, was an insured under a group accident insurance policy issued by Metropolitan Life Insurance Company.

"2. The insurance policy provided that if Jackie E. Knight sustained bodily injuries solely through violent, external and accidental means, and within ninety days thereafter suffered death as a direct

result of such bodily injuries independently of all other causes, Metropolitan Life Insurance Company would pay the beneficiary thereof Bernice M. Knight, Five Thousand Dollars ($5,000.00).

"3. Jackie E. Knight was an experienced diver.

"4. On June 28, 1964 at approximately daybreak Jackie E. Knight in the presence of others intentionally dived from a railing atop the west intake tube of the Coolidge Dam into the San Carlos Lake a distance in excess of 139 feet.

"5. As a direct result of this intentional act of diving the insured sustained injuries which resulted in his almost immediate death.

"6. Jackie E. Knight did not slip or fall from atop the Dam.

*"Conclusions of Law*

"The deceased as a reasonable man under the circumstances should have anticipated that death or serious bodily injury would result as the natural and probable consequence of his own voluntary act. Such is not accidental.

"Applying this test to the evidence there can be no recovery against the said Metropolitan Life Insurance Company."

At the time of his death, Jackie E. Knight was 22 years of age. He was an experienced diver and had been diving since he was a boy. Many times he had dived from high places, some up to 75 feet, and had on one previous occasion, jumped, feet first, from the top of Coolidge Dam into the lake. The distance to the water on the date of his death was approximately 139 feet.

The testimony surrounding the actual diving was, in part, as follows:

"Q Now, at the dam you mentioned Jackie said he wanted to dive off. What action did he take?

"A Oh, he just said that he wanted to dive, and nobody thought any more about it.

"Q Did he get up on the railing?

"A Yes, the first time.

"Q Which railing? The one towards Globe?

"A Yes.

"Q Did it appear that he was going to dive to you?

"A Yes, uh-huh.

"Q Okay, then what happened?

"A Well, Bob just reached up and grabbed him and jerked him down. He was straightening himself out getting ready to dive, and we thought it was more or less of a joke for a while, and so Bob grabbed him and wrestled him down, just playing more or less.

"Q And then what did Jackie do?

"A He laughed and said, 'What's the matter? Don't you think I can make it?' Bob said, 'Yes, but we're going to leave pretty soon anyway and that's a long way coming back up.'

"Q Then what happened?

"A Well, then we laid around a little while and Jackie just jumped up on the ledge and took off in a swan dive.

\* \* \* \* \* \*

"Q Then after you saw him dive what did you do?

"A I went to the railing and watched him fall—watched him finish his dive.

"Q Then what was the form of his dive?

"A He started out with a real real nice swan dive, but I guess what happened is he just misjudged his distance and started going down, and it was real pretty, and then he started to turn over real slow, and just probably 10 feet before he got to the water he was on his shoulders, and then on his back. But what for he hit on his back you couldn't beat it for a swan dive. It was a real pretty swan dive."

Bodily injuries from the dive resulted in almost immediate death. We are again concerned with what is an "accidental" death.

In Malanga v. Royal Indemnity Company, 101 Ariz. 588, 422 P.2d 704 (1967), our Supreme Court reaffirmed the test of

California State Life Ins. Co. v. Fuqua, 40 Ariz. 148, 10 P.2d 958 (1932), as to what is an "accidental" injury:

"'Or to put it in the affirmative form, if the result is one which in the ordinary course of affairs would not be anticipated by a reasonable person to flow from his own acts, it is accidental. The test is, what effect should the insured, as a reasonable man, expect from his own actions under the circumstances. Let us apply this test to the evidence.'"

101 Ariz. at 592, 422 P.2d at 708.

This test is exactly the test used by the trial court. There is a specific finding by the trial court [1] that the insured " * * * as a reasonable man under the circumstances should have anticipated that death or serious bodily injury would result as the natural and probable consequence of his own voluntary act."

This finding of the trial court should be sustained if there is any credible evidence in the record in support thereof. Rossi v. Stewart, 90 Ariz. 207, 367 P.2d 242 (1961). The only witness testifying as an expert at the trial was a high school gymnastics swimming and diving coach, with approximately 10 years experience in various phases of coaching and diving, including Olympic competition. Previously the witness had been successful in college-diving competition. The witness had never dived headfirst from a height exceeding 10 meters, but was acquainted with feats of diving by various exhibitionists from heights ranging from 80 feet up to, in the case of the Acapulco divers, "possibly" as high as 130 feet.

The probabilities of injury from high diving appears to this court to be in an area in which a trier of fact might be aided by expert testimony. See Udall, Arizona Law of Evidence § 23. As the trial judge commented during the trial:

"I don't know; there must be a point beyond which a person just can't dive.

For example, if you were to try to dive into a lake out of an airplane at 500 miles an hour you would say—well, it is practically suicide. Just where the point is between that and jumping—if I would jump off two feet I'd think I am doing something. There is a point in between. I don't know, so I think it would be helpful to the Court to perhaps have expert testimony. * * *"

The expert witness testified that in a headfirst dive the body structure is such that there is a tendency " * * * to take you on over to your back"; and that experienced divers, unless with years of training, particularly for exhibition dives, will not enter the water headfirst from heights in excess of fifty feet because of the risk of bodily injury. The following further testimony was elicited from this witness:

"Q * * * Assuming all these facts, he was an excellent diver, swimmer, and he had high-diving experience, and he had jumped off the dam, andsoforth, in your opinion do you feel that a boy with that experience, would you deny—would you deny under oath that a boy of that background and experience could successfully make the dive?

"A Would I deny that he could successfully make the dive?

"Q Yes.

"A Can I ask a question of you?

"Q Okay.

"A You say he jumped off—

"Q Coolidge Dam, five years before.

"A Five years before, and then came over and did the dive five years later?

"Q Right.

"A And what was it you wanted me to deny now?

"Q Do you deny that he could with all that prior background—do you deny that he could successfully make the dive? .

1. This finding of fact is mislabeled a "conclusion of law." We believe that this mislabeling is immaterial. 53 Am.Jur. Trial § 1138, pp. 793–794; 89 C.J.S. Trial § 624b, p. 452.

"Q Considering his background and experience you would deny that under oath?

"A In a five year period, yes, sir, I would have to.

"Q Well, approximately two months before he died he went up and dived maybe 75 feet from a rock on Apache Lake.

"MR. FRENCH: Excuse me, are you asking him to assume this?

"MR. RIGGS: I asked him already to. I think I forgot that fact.

"MR. FRENCH: I think he has answered your question.

"A I don't know if I have answered the question or not.

"Q Do you feel—is it—what is your opinion—do you feel that a boy with this background and experience who feels he could make the dive successfully—do you feel there is a possibility of him coming out of this in good bodily condition?

"A No, sir.

"Q You feel there is a possibility of him living after this?

"A Well, I can't say whether he is going to live or not.

"Q Is there a possibility? Would you say this or not?

"A I imagine I would have to say there is a possibility he was going to live. For how long, I don't know.

"Q Is there a possibility he could make the dive successfully under these facts?

"A With five years in between? No sir, I don't believe there would be.

"Q Would you deny under oath that there was a possibility he could make the dive successfully?

"A Yes, sir, I would. I would say under oath that there was 99% of his chances of not making that dive successfully. There is always a margin of error of 1% maybe."

■ Under the test adopted in the *Fuqua* and *Malanga* decisions, supra, we believe there was a question for the trier of fact as to whether the deceased, as a reasonable man, should have anticipated that his action in diving off Coolidge Dam would result in death or serious bodily injury. Under this test, we do not believe the absence of any evidence that the deceased subjectively intended to injure himself necessarily requires the trier of fact to find that the death was "accidental."

The appellant has asked this court in her reply brief to take judicial notice of articles in two magazines, describing the feats of Acapulco's "La Quebrada" divers. One of these articles supposedly states that the height of this cliff at Acapulco, Mexico, is 118 feet and the other article allegedly states that 130 feet is the true height. Also, appellant wishes us to take account of a letter from a Captain Jimmy Jamison stating, *inter alia,* that a successful dive from 140 feet is " * * * entirely possible for a diver with some experience * * *."

■ These items, even if properly before us, would leave the factual issue one for the trier of fact. However, material such as magazine articles and personal letters obviously falls outside of the scope of what is proper for judicial notice. Phelps Dodge Corporation v. Ford, 68 Ariz. 190, 196, 203 P.2d 633, 638 (1949).

Judgment affirmed.

HATHAWAY, C. J., concurs.

KRUCKER, Judge (dissenting):

I respectfully submit that I am unable to agree with the conclusion reached by the other members of this Court.

The facts and circumstances surrounding the event are fairly stated in the majority opinion. I also agree that the magazine articles describing Acapulco's "La Quebrada" divers and the letter from a Captain Jimmy Jamison should not be considered by this Court and the appellee's motion to strike these portions of appellant's reply brief should be granted.

The trial court had to rely upon the testimony of an alleged expert, whose admitted

experience with diving was only up to ten meters, in order to reach the conclusion of law as to the reasonable man test.

Here we have in the deceased an experienced diver, aged 22, who has been diving from heights up to 75 feet or more and who had jumped from the same dam when he was 17 or 18 years of age.

There is no contention by anyone that this young man intended to commit suicide or to injure himself in any way. He fully believed he could make the dive successfully and without injury and lost his life through a miscalculation and loss of balance by turning over just a little before striking the water. The latest pronouncement by our Supreme Court on this subject is contained in Malanga v. Royal Indemnity Company, 101 Ariz. 588, 422 P.2d 704 (1967), which states, in part:

"In the following language, this Court, in the Fuqua case, in dealing with the term 'accidental means' defined the word 'accidental', as used in accident insurance policies, and prescribed the test to be followed in order to determine if a result is 'accidental', 40 Ariz. 154, 155, 10 P.2d 958, 960:

'The third assignment of error is based upon the theory that the evidence shows conclusively that Fuqua's death did not result from *"accidental"* means. *Let us then determine the meaning of the word "accidental," as used in insurance policies of this nature.* [emphasis added]:

\* \* \* \* \* \*

'All effects are the natural, probable, and indeed inevitable consequences of definite acts or courses of action, or we must abandon our entire present system of epistemology. The so-called "accident" is as much the inevitable consequence of one specific act or course of action as is a mathematical conclusion the inevitable result of certain premises.

'If the cases supporting defendant's definition are analyzed carefully, it will be found that what they really mean is that an effect which was or should have been reasonably anticipated by an insured person to be the natural or probable result of his own voluntary acts is not accidental. *Or to put it in the affirmative form, if the result is one which in the ordinary course of affairs would not be anticipated by a reasonable person to flow from his own acts, it is accidental. The test is, what effect should the insured, as a reasonable man, expect from his own actions under the circumstances. Let us apply this test to the evidence.'* (emphasis added).

"Applying the above definition and test to the evidence in this case we conclude that the injury of Jack Ellis was 'accidental' within the meaning of the accident insurance policy. There is no evidence that the 'insured, as a reasonable man', expected or anticipated or desired the injury which resulted from his voluntary acts. He was not attempting to commit suicide or to injure himself. He did not suspect, or know, or have any reason to know that alcohol and barbiturates, when consumed in the quantities which he took, would produce an injury resulting in death. Both the injury and the death were 'accidental', as the term is commonly used and understood."

In this case, the deceased had no intention to injure himself and there is no evidence that he would have reason to believe that injury would result from his voluntary acts. I believe the Court's conclusions of law are erroneous and, therefore, the judgment should be reversed and entered in favor of the appellant.