437 P.2d 416

**Bernice M. KNIGHT, Appellant,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Inc., Appellee.**

**No. 9064–PR.**

Supreme Court of Arizona.

En Bank.

Feb. 8, 1968.

Rehearing Denied March 12, 1968.

Wilford R. Richardson, Safford, for appellant.

Kramer, Roche, Burch, Streich & Cracchiolo, Phoenix, for appellee.

UDALL, Vice Chief Justice:

This matter is before us on petition to review the decision of the Court of Appeals, Div. 2, 5 Ariz.App. 473, 428 P.2d 137. The judgment of the Court of Appeals is vacated.

At the time of his death on June 28, 1964 Jackie E. Knight was one of the named insured in a Metropolitan Life Insurance Company policy which provided: "If, while insured under the Group Policy for Insurance for Death or Dismemberment by Accidental Means, the Employee sustains bodily injuries solely through violent, external and accidental means, and within ninety days thereafter suffers any of the losses specified in Section C hereof as a direct result of such bodily injuries independently of all other causes, the Insurance Company shall pay the amount of insurance specified for such loss * * *" Named beneficiary under the policy was the appellant, Bernice M. Knight, mother of the decedent.

Jackie Knight, then 22 years of age, suffered his death almost immediately following a voluntary dive from atop Coolidge Dam in Gila County. In denying his beneficiary, Bernice M. Knight, recovery under the policy the trial court concluded as a matter of law:

*"Conclusions of Law*

"The deceased as a reasonable man under the circumstances should have anticipated that death or serious bodily injury would result as the natural and probable consequence of his own voluntary act. Such is not accidental.

"Applying this test to the evidence there can be no recovery against the said Metropolitan Life Insurance Company."

It is conceded in the evidence and the trial court made an express finding of fact that "Jackie E. Knight was an experienced ediver." The record is replete with testimony of many dives from high places Jackie had made over a period of years. He had made dives of 15, 25, 40, 50 and upwards of 75 feet from diving boards, railroad trestles, ship decks, rocky ledges and box canyons; and he had in fact (together with a friend who testified) jumped from atop Coolidge Dam in years past. It appears from the testimony of those who knew him that he was a very experienced and good diver, that he was extremely confident in his own ability, and that he had an abiding idiosyncracy or compulsion to prove that ability to himself and others by executing, over a period of years, successively higher dives.

1. "Q  And then what did Jackie do?
"A  He laughed and said, 'What's the matter?  Don't you think I can make it,' Bob said, 'Yes, but we're going to leave pretty soon anyway and that's a long way coming back up.'
"Q  Then what happened?
"A  Well, then we laid around a little while and Jackie just jumped up on the ledge and took off in a swan dive.
  *     *     *     *     *
"Q  Then what was the form of his dive?
"A  He started out with a real nice swan dive, but I guess what happened is he *just misjudged his distance* and started going down, and it was real pretty, and then he started to turn over real slow, and just probably 10 feet before he got to the water he was on his shoulders, and then on his back.  But what for he hit on his back you couldn't beat it for a swan dive.  It was a real pretty swan dive.  (Emphasis added.)
"Q  Did he mention anything before about his ability to make this dive?
"A  Not directly, but he didn't think anything of it.

Then, in the early morning of June 28, 1964, when Jackie, with several buddies was at Coolidge Dam he confidently entered into the execution of what was to be his last dive.  The testimony of a witness is set out below.[1]

The primary question presented for review is whether Jackie E. Knight's death was accidental within the meaning of the policy provision, supra.  In California State Life Ins. Co. v. Fuqua, 40 Ariz. 148, 10 P.2d 958 (1932) we examined the meaning of the word "accidental" as used in insurance policies of this nature.  In that case the insured was shot to death by police while he held a gun in his hand and may have been attempting to resist arrest.  In holding that his policy beneficiary was entitled to recover this court said:

"Defendant claims, and supports its claim by many authorities, that 'an effect which is the natural and probable consequence of an act or course of action cannot be said to be produced by accidental means.'  Giving the language of

"Q  Did he mention anything to the effect he could make it?
"A  Yes, he said he knew he could, but I didn't know at the time he had done it before; but he said he knew he could.
"Q  When he hit the water what happened after that?
"A  He went down and then he come up and started to tread water and we thought—I thought he had made it, you know.
"Q  Did you hear him say anything?
"A  He swam about thirty feet and then he hollered, 'Help!'  When he hollered 'Help' there was a fishing boat, oh, it was—they didn't—they thought we'd thrown a log in the water, and we started hollering to them and they started over there, and he hollered 'Help' once more I think, and he swam about ten feet and then he just sank.
"Q  Now, did he say anything about jumping off at that time?
"A  You mean prior?
"Q  No, at the time—just before he dived.  Did he say anything about jumping off?
"A  No, he just said that he could make it; that he knew he could. * * *."

this definition its ordinary meaning, it cannot be held true, for it is, taken literally, a denial of the possibility of an 'accident,' unless we assume that the attack recently made by some theorists upon the law of cause and effect has been successful. All effects are the natural, probable, and indeed inevitable consequences of definite acts or courses of action, or we must abandon our entire present system of epistemology. The so-called 'accident' is as much the inevitable consequence of one specific act or course of action as is a mathematical conclusion the inevitable result of certain premises.

"If the cases supporting defendant's definition are analyzed carefully, it will be found that what they really mean is that an effect which was or should have been reasonably anticipated by an insured person to be the natural or probable result of his own voluntary acts is not accidental. Or to put it in the affirmative form, if the result is one which in the ordinary course of affairs would not be anticipated by a reasonable person to flow from his own acts, it is accidental. *The test is, what effect should the insured, as a reasonable man, expect from his own actions under the circumstances. Let us apply this test to the evidence.* (Emphasis added)

The *Fuqua* test was recently reaffirmed in Malanga v. Royal Indemnity Company (1967) 101 Ariz. 588, 422 P.2d 704. In *Malanga* the insured died from a self-induced overdose of drugs (not sufficient enough in itself to cause death) and a consumption of alcoholic beverage (the quantity of which in like manner would not have caused death). If we were to apply the *Fuqua* test to the facts now before us we believe the result obtained would concur with the holding hereafter set out. However we have chosen this case as a vehicle to re-examine the meaning of "accidental," "accidental means," "accidental results," and similar terms used in health and accident policies and life policies providing double indemnity for "death by accidental means."

After the *Fuqua* case, the U. S. Supreme Court decided Landress v. Phoenix Mutual Life Ins. Co. (1934), 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934, in which the majority held that to establish liability under an accident policy covering death effected through external, violent and "accidental means" it is insufficient that death or injury was accidental in the sense of being extraordinary and unforeseen; but the means effecting such bodily injury must in themselves be external and accidental. In an oft-quoted dissent which has now become the majority rule throughout the states, Justice Cardozo said:

" * * * The attempted distinction between accidental results and accidental means will plunge this branch of the law into a Serbonian Bog. 'Probably it is true to say that in the strictest sense and dealing with the region of physical nature there is no such thing as an accident.' * * * On the other hand, the average man is convinced that there is, and so certainly is the man who takes out a policy of accident insurance. It is his reading of the policy that is to be accepted as our guide, with the help of the established rule that ambiguities and uncertainties are to be resolved against the company. * * * When a man has died in such a way that his death is spoken of as an accident, he has died because of an accident, and hence by accidental means. * * * If there was no accident in the means, there was none in the result, for the two were inseparable. * * * There was an accident throughout, or there was no accident at all." Dissenting opinion, Landress v. Phoenix Mutual Life Ins. Co. (1934), 291 U.S. 491, 498, 54 S.Ct. 461, 463, 78 L.Ed. 934, 90 A.L.R. 1382.

Upon reading the cases in those states which continue to follow the distinction between "accidental means" and "accidental results," as pointed out in the majority holding of the Landress case, supra, we

find that Judge Cardozo's prophecy is now close to fulfillment.

"* * * This whole branch of insurance law has become shrouded in a semantic and polemical maze * * * The situation is fast approaching a point where the slight flame of legal theory involved is being smothered. Some of the courts have found it necessary to resort to tortuous and tortured legal jiu-jitsu to distinguish and differentiate between 'accidental means' and 'accident,' 'accidental result,' 'accidental death,' 'accidental injury', etc." See Anno., 166 A.L.R. 469, 477.

Before this court finds itself within that Serbonian Bog of semantics and polemical maze we are going to clarify our position and determine along with the growing majority rule [2] that an accident is an accident whether it be in the "means" or the "result." In so determining we do nothing more than follow the cardinal rule of contract construction—the intention of the parties.

One paying the premium for a policy which insures against "death by accidental means" intends to provide benefits to his family or named beneficiary in the event he should suffer death *caused by accident* as opposed to death caused by other means, such as suicide, murder, disease or natural death. He intends to insure against the fortuitous, the unintentional, and the unexpected, that which happens through mishap, mischance or misjudgment. When he pays *that premium month after month* he does not intend that any act committed by him, no matter how daring, reckless or foolhardy, be adjudged by a court under "reasonable man tests" or "natural and probable consequence" standards to deprive his

beneficiary of contractual rights arising out of his unintended and unexpected and, therefore, accidental death.

The term "accidental means" as used in this policy should not be construed in a technical sense but should be given its ordinary and popular meaning according to common speech and usage and the understanding of the average man, Anno. 166 A.L.R. 474. Insurance policies upon which the public relies for security in case of accident should be free from fine distinctions which few can understand until pointed out by lawyers and judges, Burr v. Commercial Travelers Mutual Accident Asso. (1946), 295 N.Y. 294, 67 N.E.2d 248, 166 A.L.R. 462.

Insurance companies are the drafters of the policies they sell and if they want to exclude against reckless and foolhardy acts, such as driving at high rates of speed on an unfamiliar mountain road, Scott v. New Empire Ins. Co. (1965), 75 N.M. 81, 400 P.2d 953; or self-administering an overdose of narcotics, Beckham v. Travelers Ins. Co. (1967), 424 Pa. 107, 225 A.2d 532; or placing a gun to one's chest and pulling the trigger three times just to frighten one's friends, Gulf Life Ins. Co. v. Nash, 97 So.2d 4 (Fla.1957); or attempting a swan dive from perilous heights they have it in their power to make such exclusions. With simplicity and clarity of expression they may remove all doubt, Murphy v. Travelers Ins. Co., 141 Neb. 41, 2 N.W.2d 576. On the other hand ambiguous and uncertain terms like "accidental means" should be construed in favor of the insured.

The policy here in question had certain exclusionary clauses among which were

2. "This attempted distinction between 'accidental means' and 'accidental injury or death,' as a rationale for a decision in a given case, has not been followed by a majority of courts today * * * bench and bar have demonstrated their distaste for such logomachy." 2 Richards on Insurance 734, § 216 (5th Edition 1952).

Among the states which have repudiated or rejected the distinction here under discussion are Arkansas, Colorado, Idaho, Iowa, Kansas, Nebraska, New York, Oklahoma, Pennsylvania, South Carolina, Utah, Vermont, Virginia, Washington, Wisconsin.

Jurisdictions which have considered the question as one of first impression during the past decade have uniformly chosen the Cardozo approach. Gulf Life Ins. Co. v. Nash, 97 So.2d 4, 8 (Fla.1957); Scott v. New Empire Ins. Co., 75 N.M. 81, 400 P.2d 953 (1965).

disease, surgical treatment, acts of war and any loss which is "caused by or resulting from intentional self-destruction * * * while sane or insane." No affirmative defense of suicide was here asserted and in fact it was conceded that Jackie Knight did not intend to commit suicide.

Jackie E. Knight attempted a very daring dive. That a reasonable man might consider his voluntary stunt foolhardy does not of itself make the result any less accidental. He thought he could successfully perform the feat; and if he had not suffered the mishap of rolling over on his back just before he hit the water who is there to say that he would not be attempting dives from even greater heights today? "When a man has died in such a way that his death is spoken of as an accident, he has died because of an accident, and hence by accidental means." Landress v. Phoenix Mutual Ins. Co., dissenting opinion, supra.

The judgment of the trial court is reversed and it is directed that judgment be entered for plaintiff for the amount of insurance specified in the policy for death by accidental means.

McFARLAND, C. J., and STRUCKMEYER, BERNSTEIN and LOCKWOOD, JJ., concur.