473 P.2d 464

**Ruth Audrey WATKINS, Appellant,**

v.

**UNDERWRITERS AT LLOYD'S, LONDON, Appellee.**

**No. 1 CA–CIV 1096.**

Court of Appeals of Arizona, Division 1, Department A.

Aug. 18, 1970.

Rehearing Denied Sept. 25, 1970.

Review Granted Nov. 4, 1970.

O'Connor, Cavanagh, Anderson, West-over, Killingsworth & Beshears, by John H. Westover and James A. Teilborg, Phoenix, for appellant.

Snell & Wilmer, by Roger W. Perry and George C. Wallach, Phoenix, for appellee.

DONOFRIO, Presiding Judge.

This is an appeal from a judgment in favor of the defendant (appellee insurance company) which was based on a directed verdict made at the close of plaintiff's (appellant's) case and from a denial of plaintiff's motion for new trial.

The action was brought by appellant to recover the benefits of a certificate (policy) of insurance in which her deceased husband, Clyde B. Watkins, was the assured. The central issue on appeal is whether or not Watkins' death fell within the coverage of the certificate, hereinafter designated as the insurance policy.

We shall quote only the clauses of the policy that are pertinent to the determination of the issues involved herein. The insuring clause of the policy provided:

"A. INSURING CLAUSE: If at any time during the currency of this Certificate the Assured shall sustain any *accidental bodily injury* which shall solely and independently of any other cause within twelve (12) calendar months from the date of the accident causing such

bodily injury occasion the disablement of the Assured as hereafter defined and a claim be substantiated under this Certificate, the Underwriters will pay to the Assured, his Executors, Administrators or Assigns (or in case such bodily injury shall occasion the death of the Assured, to the Beneficiary or Beneficiaries named herein) according to the schedule of Compensation herein specified within thirty (30) days after satisfactory proof of death or disablement to the Underwriters (or in the case of disablement as defined in Item No. 8 of the Schedule of Compensation hereunder, within seven (7) days after the final settlement and adjustment of the claim) not exceeding in all the Capital sum of $60,000.00 in respect of Benefits 1, 2, 4 & 6 inclusive and in respect of Benefits 3 & 5 & 7 not exceeding $30,000.00 in all." (Emphasis supplied)

The language used in the insuring clause is defined in the policy as follows:

"E. DEFINITIONS: It is understood and agreed that:

\*   \*   \*   \*   \*   \*

"2. Bodily injury which shall occasion death includes in addition to the coverage herein provided, death by exposure to the elements or physical exhaustion or drowning resulting from an accident or mechanical or other failure of anything used as a means of conveyance or transportation.

The policy further provided:

"G. CONDITIONS:

"1. EXCLUSIONS: This certificate does not cover death, injury, or dismemberment.

\*   \*   \*   \*   \*   \*

(b) Directly or indirectly caused or contributed by \* \* \* disease or natural causes, \* \* \* "

To better understand the issues involved, it is necessary to set forth the essential facts, including those surrounding Watkins' death.

The decedent was engaged in the cattle business in Yuma. His activities were pri-marily administrative, buying and selling cattle and feed principally by telephone, and acting as foreman of the operation. On occasion, but not daily, he inspected cattle by horseback, but neither his occupation nor his activities, except on rare occasions, involved any physically strenuous work. Watkins was above five feet ten inches tall and weighed approximately two hundred thirty pounds. The insurance policy was issued to Watkins upon his application on July 17, 1967, at which time he was fifty-two years of age. Thereafter, in September of the same year, he complained of chest pain while helping select calves for his son. About a month later, and only one night before he died, the decedent and his wife were hurrying to a football game when he again complained that his chest hurt, requiring him to slow his pace. These two instances comprise Watkins' only known history of complaints arising from chest or heart pain.

On the night of his death Watkins was at home watching television. At about 8:15 p. m. he received a telephone call advising him that some steers were loose at one of his cattle pens. He drove his son and two other persons to the pens, only a short distance from his home. There, for about fifteen minutes the decedent moved rapidly around in the soft, sandy ground of the field, physically assisting in the attempt to round up the steers. He then complained that he did not feel well, mentioning that his heart hurt. He also stated that he felt dizzy, whereupon he returned to the feedlot office, called his wife, told her that he was ill, and asked her to come to the feedlot. Watkins lay down and shortly thereafter started to breathe hard, and began to cough. He asked for and was given a drink of water. His employees placed a towel on his head and rubbed his hands and feet. Approximately twenty-five minutes after the exertion he expired. At the time of the insured's death the policy had been in effect about three months.

An autopsy was performed which revealed that Watkins' heart was slightly enlarged. The coronary vessels showed

marked atherosclerosis and a thrombus or blood clot was found to have completely occluded the left anterior descent coronary artery. The blood clot was located about one centimeter from its point of origin. Cut surfaces of myocardium or heart muscle showed the muscle to be red-brown, soft and well developed. There was no evidence of infarction. The heart blood vessels indicated the presence of arteriosclerosis. Microscopic sections of the place where the blood clot was located revealed an atherosclerotis plaque. Atherosclerosis and arteriosclerosis are distinguishable:

"*Atherosclerosis* and *arteriosclerosis* are not the same condition. In atherosclerosis there are fatty deposits forming plaques on the walls of the arteries. These plaques are not symmetrically or universally distributed but occur in irregularly distributed and selective locations. There is a definite relationship between the deposit of lipids and formation of atheromatous plaques and the cholesterol level of the blood, and in turn a relationship to diet which is rich in cholesterol and saturated fats. Arteriosclerosis, on the other hand, is a universal disease related to the aging process. There is a loss of muscular and elastic elements in the medial coat of the arteries, and as age advances the arteries become tortous, with calcification in the medial coat. As a general rule, this does not lead to occlusion of the lumen or rupture of the wall. Atheromatous plaques, on the other hand, are favorite sites for formation of thrombi (clots) leading to occlusion. * * * *" 3 A.R. Gray, Attorneys Textbook of Medicine ¶ 91.01 (1963)

It was further revealed that there were red blood cells within the atherosclerotic plaque. Inasmuch as these blood cells had not degenerated, it appeared that the blood within the plaque was of recent origin.

Dr. A. D. Musgrave, the Yuma pathologist who performed the autopsy, was called by the appellant to testify. He characterized Watkins' atherosclerosis as "severe". It was stipulated during his cross-examination that had this condition not been present the heart attack would not have occurred. The following dialogue took place in the course of Dr. Musgrave's cross-examination:

"Q   In other words, then, but for the condition of disease which you demonstrated this heart attack would not have occurred?

"MR. WESTOVER: I will stipulate to that

"MR. PERRY: I will accept the stipulation. I have no further questions."

Dr. Stephen R. Elek, a cardiologist called from California to testify for the plaintiff, gave the following answers to questions by counsel for the appellees concerning Watkins' death:

"Q   He died then, at least in part, as the result of heart disease?

"A   No. The cause of his death was not in part but completely due to it.

"Q   Heart disease?

"A   Yes."

On direct examination Dr. Elek was asked to express his opinion, based on a reasonable degree of medical probability, as to the potential life expectancy of an individual who has the condition described in the pathologist's report:

"A   There is autopsy evidence of course that he did have narrowing of the arteries due to atherosclerosis and arteriosclerosis. That is to say, both the inner coat or lining were hardened as well as the middle coat which contains the muscle. So, he did have hardening of the arteries. But that is a structural abnormality which is important to the patient and to a cardiologist like myself, does or does not the patient have symptoms from this disease or disability. Apparently according to the hypothesis he had no symptoms in previous years that would indicate that despite the narrowing of that blood vessel. Enough blood was getting through to supply the heart muscle and to permit average function

based upon the average activities of the individual. That would mean in this instance such an individual could have lived five, ten, fifteen years. I can't be more specific than that not knowing other factors. I think I could be more specific if other factors were known. That is the answer I think you asked me about."

In the record before us, no medical definition is submitted for the phrase contained in the policy "death by physical exhaustion" and insofar as we can determine, no medical meaning exists for the term.

Appellant's position in this action is that her husband died as a result of his strenuous physical exertion at the cattle pens, and that his death under those circumstances fell within the policy coverage of death due to "physical exhaustion." Appellant also argues that although the autopsy revealed the decedent's arteriosclerotic condition, his death was not "directly or indirectly caused or contributed to by * * * disease * * *" and thus coverage could not be denied on the basis of that policy exclusion.

The appellee assumes the view that Watkins' death was not due to physical exhaustion, and that even if it were to concede such, the physical exhaustion did not result from an accident. Therefore, runs the appellee's argument, the appellant cannot recover under the policy.

The judgment herein is based on a directed verdict at the close of plaintiff's case. Whether the directed verdict was proper depends upon the interpretation given the policy coverages and exclusions hereinbefore set forth.

 Arizona law is well settled that upon appeal from a directed verdict the evidence will be viewed in a light most favorable to the appellant. An assumption is made that all competent evidence introduced by the appellant and all inferences that can reasonably be drawn therefrom are true. If the minds of reasonable men may differ on the inferences to be drawn from the evidence, the case must be submitted for determination by the jury. Avechuco v. Awtrey, Ariz., 470 P.2d 451 (filed 11 June 1970); Stanfield v. Anderson, 5 Ariz. 1, 43 P. 221 (1896). If, in consideration of the foregoing principle of law the jury in the trial of this case was precluded from consideration of what were properly questions for it, the judgment of the trial court must be reversed. Thus, we must examine the policy provisions.

The policy in question is unique among accidental death insurance policies. We are unable to determine that any other life or accident insurance company writes policies identical to or even very similar to the one issued by the appellee. For that reason other cases, with one exception, provide guidelines of limited utility in interpreting the instant language. The one decision involving a policy identical to the one in this case is Zuckerman v. Underwriters at Lloyd's, London, 250 P.2d 653 (Cal.Dist.Ct. App.1953), rev'd, 42 Cal.2d 460, 267 P.2d 777 (1954). This was a case in which the jury's verdict in favor of defendant Underwriters at Lloyd's was ultimately affirmed. In Zuckerman, supra, the insured had taken a fishing trip with friends in Baja, California, and as a result of a storm was unable to return to the mainland, spending a night without shelter on a cold island. The insured suffered chills and later caught cold. On his return to the United States he sought the advice of a physician, and medication was prescribed. Driving from Los Angeles to the California desert to "bake out" his cold the decedent apparently stopped to rest, for his body lying undisturbed in the back seat of his car was found there two days later. The claim under the policy was that he died as a result of bronchopneumonia which had been brought on by his experiences on the fishing trip. The court in that case considered a policy exclusion upon which the appellee here relies. That is the provision which excludes coverage for death "directly or indirectly caused or contributed to by intentional self-injury, disease or natural causes, suicide or attempted suicide." The court said that as a rule

an insurer is liable on such a policy, although death is caused partly by preexisting disease or infirmity and partly by accident, so long as the accident is the prime or moving cause, but that in this case the jury was free to conclude that death was not due to an accident. The insurer's evidence tended to prove that death was due to an overindulgence in alcohol, combined with a small ingestion of barbiturates, and added to a preexisting heart condition. We believe that the case at bar is similar to Zuckerman in the respect that the jury question presented was whether or not the insured died from physical exhaustion due to an accident.

We are aware of the Arizona Supreme Court's decision in New York Life Ins. Co. v. Greber, 55 Ariz. 261, 100 P.2d 987 (1940), but find that that case, which involved a life insurance policy with a double indemnity provision for death resulting "solely through external, violent and accidental cause", is distinguishable from the instant case. The policy language relating to accidental death in Greber, supra, is quite different from that herein involved. There, recovery was made contingent, inter alia, upon a finding of "violent" death. The test established by our Supreme Court in Greber to determine whether an existing disease could preclude recovery was a test to be applied specifically to coverage under double indemnity provisions of life insurance policies:

"* * * When double indemnity is claimed for an accidental death *under a policy like that involved herein,* it is incumbent upon the beneficiary to establish affirmatively and by a reasonable preponderance of the evidence that the death of the insured resulted from the specific cause of death set forth in the double indemnity clause. * * *" (Emphasis supplied) 55 Ariz. at 262, 100 P.2d at 987

Holding only that the evidence did not sustain the verdict and judgment entered for the plaintiff-beneficiary, the Court in Greber reversed and remanded. Upon remand the case was tried again and the plaintiff appealed from a verdict directed

against her. In Greber v. New York Life Ins. Co., 61 Ariz. 341, 149 P.2d 671 (1944), it became apparent that there was no factual issue for the jury in light of the very narrow policy coverage. The policy involved in Greber and the one with which we are here concerned are too dissimilar to make the test set forth in that case dispositive of the instant case.

The appellant's theory being that death of the insured was the result of physical exhaustion brought on by his strenuous exertion at the cattle pens, our attention is directed toward the meaning of the term "physical exhaustion."

We have noted that this term has no known medical meaning, nor can a definition of the term be found in reported decisions. The dictionary definition of "physical" is as follows:

"physical * * * 4a: of or relating to the body ([physical] strength)—often opposed to *mental* . b: concerned or occupied with the body and its needs. * * *" Merriam-Webster New International Dictionary 1706 (3rd ed. 1965)

"Exhaustion" has been given the following medical definition:

"Exhaustion * * * 1. Privation of energy with consequent inability to respond to stimuli. 2. Withdrawal. 3. Condition of emptiness caused by withdrawal * * *." Dorland's Illustrated Medical Dictionary 523 (24th ed. 1965)

In subparagraph 2 of paragraph E of the policy hereinbefore set forth is the "additional" coverage upon which the appellant relies for her claim. Death by "exposure to the elements or physical exhaustion or drowning resulting from an accident" is the policy language.

■ The appellee asserts that the phrase "resulting from an accident" modifies "physical exhaustion" as well as "drowning". In determining what that phrase modifies, it is our duty to construe the subparagraph in its entirety, and taking it as a whole endeavor to ascertain the mutual intention of the parties. Although un-

certainties and ambiguities in insurance policies are to be resolved against the insurer, D. M. A. F. B. Fed. Cr. U. v. Employers Mut. L. Ins. Co. of Wis., 96 Ariz. 399, 396 P.2d 20 (1964), courts must avoid the use of strained and unnatural construction of policy terms which could create an uncertainty or ambiguity. An insurance contract term is neither uncertain nor ambiguous if its meaning can be ascertained by fair inference from other terms of the instrument. Sampson v. Century Indemnity Co., 8 Cal. 2d 476, 66 P.2d 434, 109 A.L.R. 1162 (1937). Applying these rules of construction, we agree with the appellee's construction of the sentence that the phrase "resulting from an accident" modifies "physical exhaustion."

We are faced with a greater problem in interpreting the meaning of these terms, and particularly the term "physical exhaustion", as the latter term has no medical nor case law definition, nor is it defined in the policy. In Knight v. Metropolitan Life Insurance Company, 103 Ariz. 100, 437 P.2d 416 (1968), the Arizona Supreme Court emphasized that a term in an insurance policy should be given its ordinary meaning:

> "The term 'accidental means' as used in this policy should not be construed in a technical sense but should be given its ordinary and popular meaning according to common speech and usage and the understanding of the average man, Anno. 166 A.L.R. 474. Insurance policies upon which the public relies for security in case of accident should be free from fine distinctions which few can understand until pointed out by lawyers and judges, Burr. v. Commercial Travelers Mutual Accident Asso. (1946), 295 N.Y. 294, 67 N.E.2d 248, 166 A.L.R. 462." 103 Ariz. at 104, 437 P.2d at 420

In another recent insurance case involving the meaning of accidental bodily injury, Malanga v. Royal Indemnity Company, 101 Ariz. 588, 422 P.2d 704 (1967), the Supreme Court said:

> " * * * When the language of such a policy is unclear this Court has been and continues to be guided by the general rule

' * * * that policies of this nature are construed in favor of the injured when any ambiguity appears therein.' Dickerson v. Hartford Accident and Indemnity Company, 56 Ariz. 70, at 76; 105 P.2d 517, 519. Another principle often applied in these cases and applied to this Court in the Dickerson case is that the undefined words of an accident insurance policy will be defined in the common sense terms of the average layman rather than in the terms of a highly technical medical definition." 101 Ariz. at 591, 422 P.2d at 707

The case then went on to interpret the term upon which the parties had differed, "accidental bodily injury." Although the facts are dissimilar, we believe the reasoning in Malanga as it relates to the meaning of "accident" is applicable to the instant case. We have particular reference to the following language found therein, quoted from California State Life Ins. Co. v. Fuqua, 40 Ariz. 148, 10 P.2d 958 (1932):

> " ' * * * The so-called "accident" is as much the inevitable consequence of one specific act or course of action as is a mathematical conclusion the inevitable result of certain premises.

> " 'If the cases supporting defendant's definition are analyzed carefully, it will be found that what they really mean is that an effect which was or should have been reasonably anticipated by an insured person to be the natural or probable result of his own voluntary acts is not accidental. *Or to put it in the affirmative form, if the result is one which in the ordinary course of affairs would not be anticipated by a reasonable person to flow from his own acts, it is accidental. The test is, what effect should the insured, as a reasonable man, expect from his own actions under the circumstances. Let us apply this test to the evidence.'* (emphasis added)." 101 Ariz. at 592, 422 P.2d at 708

The evidence established that the insured was a sedentary person. Whether the circumstances at the feedlot and his unusual physical activity on the night of his

death, which activity was followed by cardiac failure, combined to result in death from physical exhaustion due to an accident as laymen would understand those words, is the crucial question. In the only reported case we have found which has construed a policy identical to this one, Zuckerman v. Underwriters at Lloyd's, London, supra, questions similar to the ones with which we are here faced were presented to the jury.

It was error to grant a directed verdict. Remanded.

STEVENS and CAMERON, JJ., concur.