481 P.2d 849

**Ruth Audrey WATKINS, Appellant,**

v.

**UNDERWRITERS AT LLOYDS, LONDON, Appellee.**

**No. 10197–PR.**

Supreme Court of Arizona, In Banc.

March 12, 1971.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, by John H. Westover and James A. Teilborg, Phoenix, for appellant.

Snell & Wilmer, by Roger W. Perry and George C. Wallach, Phoenix, for appellee.

UDALL, Justice:

Plaintiff, Ruth Audrey Watkins, brought an action to recover as beneficiary under an accident insurance policy in which her deceased husband was the insured. The trial court directed a verdict for defendant, Underwriters at Lloyds, London, upon testimony that the fatal heart attack in question would not have occurred "but for" certain heart disease. The Court of Appeals reversed the directed verdict, 12 Ariz.App. 539, 473 P.2d 464 (1970), holding that questions of fact were presented which required determination by a jury.

The decision of the Court of Appeals is vacated. For the reasons advanced below, the judgment of the trial court is affirmed.

The death of Mr. Watkins resulted from a heart attack which was brought on by his strenuous efforts in rounding up some stray steers. The central question presented by the case is whether the death was occasioned by accidental bodily injury "solely and independently of any other cause" and which was not "directly or indirectly caused or contributed to by * * disease or natural causes."

The facts relevant to the determination of this appeal are as follows: The decedent was engaged in the cattle business in Yuma. His activities were primarily administrative—buying and selling cattle and feed, principally by telephone, and acting as foreman of the operation. Occasionally he inspected cattle by horseback, but neither his occupation nor his other activities, except on rare occasions, involved any physically strenuous work. Watkins was about 5′ 10″ tall and weighed approximately 230 pounds. The insurance policy was issued to Watkins as of July 17, 1967, at which time he was 52 years old. In September of the same year he complained of chest pain while helping select calves for his son. About a month later, and only one night before he died, decedent and his wife were hurrying to a football game when he again complained that his chest hurt, requiring him to slow his pace. These two instances comprise Watkins' only known history of complaints arising from chest or heart pain.

On the night of his death Watkins was at home watching television. At about 8:15 p. m. he received a telephone call advising him that some steers were loose at one of his cattle pens. He drove his son and two other persons to the pens, a short distance from his home. For about fifteen minutes the decedent moved rapidly around in the soft, sandy ground of the field, physically assisting in the attempt to round up the steers. He then complained that he did not feel well and felt dizzy, mentioning that his heart hurt. He returned to the feedlot office where he called his wife, told her he was ill, and asked her to come to the feedlot. Watkins lay down and shortly thereafter started to breathe heavily and began to cough. He asked for and was given a drink of water. His employees placed a towel on his head and rubbed his hands and feet. A few minutes later he expired. At the time of the insured's death the policy had been in effect about three months.

The clauses of the policy which are pertinent to the determination of this appeal are as follows:

"A. INSURING CLAUSE: If * * the Assured shall sustain any *accidental bodily injury which shall solely and independently of any other cause * * occasion the disablement [or death] of the Assured * * *, the Underwriters will pay to the Assured, his Executor * * * or Beneficiaries [the amount or amounts herein specified]

\* \* \* \* \* \*

E. DEFINITIONS: It is understood and agreed that:

\* \* \* \* \* \*

2. *Bodily injury which shall occasion death includes* * * * *death by* exposure to the elements or *physical exhaustion* or drowning *resulting from an*

*accident* or mechanical or other failure of anything used as a means of conveyance or transportation.

\* \* \* \* \* \*

### G. CONDITIONS:

1. EXCLUSIONS: This certificate does *not* cover death, suicide, injury, or dismemberment:

\* \* \* \* \* \*

(b) *Directly or indirectly caused or contributed to by * * * disease or natural causes * * *."* [Emphasis added.]

From the above it is apparent that, in order for the plaintiff to recover as beneficiary under the terms of the policy: (1) the insured, Mr. Watkins, must have sustained *accidental bodily injury which, solely and independently of any other cause,* occasioned his death; *and* (2) his death must *not* have been directly or indirectly *caused or contributed to by disease or natural causes.*

Plaintiff's position in this appeal is that her husband died as a result of his strenuous physical exertion at the cattle pens, and that his death under those circumstances fell within the policy coverage of death due to "physical exhaustion." Plaintiff also argues that although the autopsy revealed the decedent's heart to have had an atherosclerotic and arteriosclerotic condition, as discussed hereafter, his death was not "directly or indirectly caused or contributed to by disease" and coverage could not be denied on the basis of that policy exclusion.

Defendant insurance company argues that Watkins' death was due to the diseased condition of his heart and not merely to "physical exhaustion", and that even if it were to concede that death *was* due to physical exhaustion, said physical exhaustion did *not* result from an *accident.* Therefore, runs the defendant's argument, plaintiff Watkins cannot recover under the policy.

Our primary emphasis in this opinion will be as to the application of the "disease and natural causes" exclusion in the policy, for the reason that the trial court relied on that clause in holding that Watkins' death was not covered under the policy. The question is whether Watkins' death was "directly or indirectly caused or contributed to by disease or natural causes" so as to preclude recovery. As to this question, we shall first look to the evidence presented at the trial. The wife and son and an employee of the deceased testified as to events surrounding his death. Plaintiff's counsel then called Dr. Musgrave, the pathologist who performed the autopsy on the deceased and Dr. Elek, a cardiologist who gave his opinion as to the nature of Mr. Watkins' heart condition and its relation to his death.

Dr. Musgrave testified that his autopsy revealed that Watkins' heart was slightly enlarged. A blood clot was found to have completely occluded the left anterior descent coronary artery. The coronary vessels showed marked *athero*sclerosis, as well as *arterio*sclerosis. These two conditions are distinguishable:

*"Athero*sclerosis and *arterio*sclerosis are not the same condition. *In atherosclerosis there are fatty deposits forming plaques on the walls of the arteries.* These plaques are not symmetrically or universally distributed but occur in irregularly distributed and selective locations. There is a definite relationship between the deposit of lipids and formation of atheromatous plaques and the cholesterol level of the blood, and in turn a relationship to diet which is rich in cholesterol and saturated fats. Arteriosclerosis, on the other hand, is a universal disease related to the aging process. There is a loss of muscular and elastic elements in the medial coat of the arteries, and as age advances the arteries become tortous, with calcification in the medial coat. As a general rule, this does not lead to occlusion of the lumen or rupture of the wall. Atheromatous plaques, on the other hand, are favorite sites for formation of thrombi [clots] leading to occlusion. * * *".* [Emphasis added.] 3A Gray,

Attorneys' Textbook of Medicine ¶ 91.01 (1963).

Dr. Musgrave testified that the left anterior descent coronary artery was about 70% occluded [blocked off] as a result of a plaque [fatty deposit] which had formed there because of atherosclerosis. As a result, that blood vessel had only about 30% of its normal capacity.

From the medical testimony given at the trial, it appears that the sequence of events which led to Watkins' death was as follows: When Watkins was engaging in the strenuous physical exertion involved in rounding up the steers, his heart was called upon to supply an unusually large quantity of blood to his body. The occluded coronary artery mentioned above was not able to accommodate the full flow of blood which the heart was attempting to force through it, and a blood clot developed. This blood clot then moved about one centimeter from its point of origin and completely blocked off the left anterior descent coronary artery. This caused "ischemia", or general deprivation of blood supply throughout the heart, which in turn resulted in marked irritability of the heart muscle. This caused the heart to be erratic in its rhythm. The onset of this abnormal rhythm was accompanied by a feeling of dizziness; within a few minutes the abnormal rhythm caused the heart to stop beating and death resulted.

In the course of his testimony, Dr. Musgrave characterized Watkins' atherosclerosis as "severe." During the cross-examination of Dr. Musgrave, it was stipulated by counsel that had this heart condition not been present the heart attack would not have occurred:

"Q In other words, then, but for the condition of disease which you demonstrated this heart attack would not have occurred?

MR. WESTOVER (Plaintiff's counsel): I will stipulate to that.

MR. PERRY: I will accept the stipulation. I have no further questions."

Dr. Elek, the cardiologist called from California to testify for the plaintiff, gave the following answers to questions concerning Watkins' death:

"Q He died then, at least in part, as the result of heart disease?

A No. The cause of his death was not in part but completely due to it.

Q Heart disease?

A Yes."

At the close of the plaintiff's case, the trial court granted defendant's motion for a directed verdict:

"IT IS NOW ORDERED in relation to the motion of the defendant for a directed verdict, the testimony as far as exclusion is concerned, leaves no fact question for the Jury to deliberate upon in that the death was due completely to heart disease. Therefore, defendant's motion may be granted."

On appeal, plaintiff argues that the case presented questions of fact which should have been submitted to the jury, and that the trial court was therefore in error in directing a verdict for the defendant. In support of this proposition, plaintiff cites Zuckerman v. Underwriters at Lloyds, London, 250 P.2d 653 (Cal.App. 1952); vacated 42 Cal.2d 460, 267 P.2d 777 (1954), a case involving an insurance policy with exactly the same language as that in the case at bar. In Zuckerman, the jury returned a verdict in favor of the defendant insurance company, and the trial court entered judgment on the verdict. The case was appealed because of disputes as to the law given the jury in the instructions. The California Court of Appeals, Second District, reversed and remanded for a new trial. The Supreme Court vacated the decision of the Court of Appeals and affirmed the judgment of the trial court.

In the Zuckerman case, the deceased insured was on a fishing trip with some friends in several small boats off the coast of Baja, California. About 9:00 in the morning a storm came up which created

very rough water. The deceased and the two men with him fought their way toward a small island. The two outboard motors on their 14-foot boat gave out, and it was necessary to resort to oars to keep the boat from capsizing. The deceased rowed the boat the last 1500 feet or so into the small island, fighting winds of 35–40 m. p. h. He and his friends were marooned on this island for nearly 24 hours and were exposed to the storm most of the time as they had inadequate shelter and little firewood. They were able to return to the mainland the next day and at that time the deceased complained of not feeling well. The next day he woke up with a bad cold and three days later, his condition having worsened, he decided to drive to his brother's house in the desert to "bake out." Two days after that, he was found dead in the back seat of his locked car parked en route to his brother's house.

The plaintiffs in the Zuckerman case contended that the insured died from "exposure and exhaustion resulting from an accident", (i. e., the failure of the boat's motors which resulted in exposure to the storm for some 24 hours, causing the broncho-pneumonia which led to his death). The defendant insurer claimed that the death was caused by suicide or was contributed to by edema of the brain due to alcoholism. There was marked conflict in the medical testimony about the cause of death, and in the lay testimony about the habits of the deceased concerning drinking and the taking of sleeping pills. Also, there was highly conflicting medical evidence concerning whether the deceased had a diseased heart. Determining *which* condition caused the death of the insured was the question of fact for the jury in Zuckerman. In contrast, there is no dispute of fact in the instant case concerning how or why Mr. Watkins died and what events, medical and nonmedical, lead to his death. The lay and medical testimony was undisputed. The question in the instant case is simply that of what law to apply to the undisputed facts.

As to the law which is to be applied, we refer to the rule set forth by this Court in New York Life Insurance Company v. Greber, 55 Ariz. 261, 100 P.2d 987 (1940). In that case, the action was brought under the double-indemnity provision of a life insurance policy. The *life* insurance policy provided for payment of a stated amount upon proof of death of the insured; nothing else was required. In order to collect under the *double indemnity* provision, however, it was necessary to prove that the death of the insured resulted from accidental bodily injury "directly and independently of all other causes." The double indemnity provision, then, was in effect an accidental death policy attached to a life insurance policy. In the instant case we have simply an accidental death policy with no life insurance policy [i. e., requiring only proof of death] involved. The question in Greber and in the instant case as to the application of the accidental death provisions is therefore the same.

In Greber, the insured was in an automobile accident in which he received a severe blow to the chest. He had previously been quite ill, suffering from the diseases of myocarditis and bronchial asthma, but was allowed by his doctor to drive around in his car and while doing so this accident occurred. In the hospital he expectorated blood for several days and the right side of his body was black and blue from bruises received in the accident. He went home for awhile and then returned to the hospital with pneumonia where he died a few days later, some two months after the automobile accident. The Court held as a matter of law that the plaintiff had failed to sustain the burden of proving that the insured's death was due solely to the accident. In so holding, this Court set forth the following rules as the law to be applied to the facts of the case:

"The law applicable may be stated as follows: When double indemnity is

claimed for an accidental death under a policy like that involved herein, it is incumbent upon the beneficiary to establish affirmatively and by a reasonable preponderance of the evidence that the death of the insured resulted from the specific cause of death set forth in the double indemnity clause. *If the question is whether the death resulted solely from accidental causes, the test is as follows:* (a) When an *accident causes a diseased condition* which, together with the accident, results in death, the accident alone is considered the cause of death; (b) when at the time of the accident the insured was suffering from some disease, but such *disease had no causal connection with the death resulting from the accident,* the accident is the sole cause of the death, and (c) *when at the time of the accident there was an existing disease which, cooperating with the accident, resulted in the death, the accident cannot be considered as the sole cause, independent of all other causes.*" [Emphasis added.] 55 Ariz. at 262–263, 100 P.2d at 987.

In the Greber case, this Court reversed and remanded for a new trial. At the new trial the court granted a directed verdict for the defendant insurance company. On appeal, this Court sustained the action of the trial court and reaffirmed its holding as quoted above. Greber v. New York Life Insurance Co., 61 Ariz. 341, 149 P.2d 671 (1944). In the interim between its two considerations of the Greber case, this Court had decided Dickerson v. Hartford Accident & Indemnity Co., 56 Ariz. 70, 105 P.2d 517 (1940). That case involved a policy which precluded recovery for death or disability caused directly or indirectly by disease. This Court cited as authority the holding in the Greber case as it is quoted above. In addition, the Court defined the term "disease" as used in the policy:

"*The question for us then is, what is meant by the term 'disease' as used in the policy,* for the answer to this will determine whether the court erred in granting a directed verdict? In passing on this question, we must remember that policies of this nature are construed in favor of the insured when any ambiguity appears therein. We must also consider the fact that those who are insured by policies of this nature are generally, as in the present case, not highly trained medical specialists but ordinary laymen. Under these circumstances, *we think we should adopt the definition of the word 'disease' which would naturally be accepted by the average layman, rather than a highly technical medical definition, if there is a conflict between the two.* Webster gives two definitions of 'disease.' The first is, 'a condition in which bodily health is seriously attacked, deranged or impaired,' and the second—a pathological definition—is 'an alteration of the state of the human body * * * or some of its organs or parts, interrupting or disturbing the performance of the vital functions.'

"*We think these definitions* represent the sense in which 'disease' is understood by the layman, and that they *imply a condition which either has impaired, or presumably will impair, if it continues in its usual course of progress, the normal working of some of the bodily or mental functions.* An example of the last class is a cancer, which even in its earliest stages is a disease, for while the victim may not for some time suffer any impairment of the bodily functions, if that cancer continues to develop in its normal manner, sooner or later death ensues." [Emphasis added.] 56 Ariz. at 76–77, 105 P.2d at 519–520.

The above definition of "disease" was quoted in the annotation located at 84 A.L.R.2d 176, "Pre-existing Physical Condition as Affecting Liability Under Accident Policy or Accident Feature of Life Policy", in support of the statement that "the terms 'disease' and 'infirmity' are given their commonly understood meanings and are construed to be practically synonymous." 84 A.L.R.2d at 192–193.

As to the factor of disease, and its significance in the instant case, we offer the following summary: The policy under which the deceased was insured contained a clause excluding coverage for injury or death "directly or indirectly caused or contributed to by * * * disease or natural causes." In order for this exclusion to apply: (1) There must have been a *disease*; and (2) The disease must have *caused or contributed to* the injury or death. We will consider these two factors in order:

1. *Was there a "disease"?* The insured, Clyde B. ("Grady") Watkins, suffered from both arteriosclerosis and atherosclerosis. Atherosclerosis had blocked off 70% of the insured's left anterior descent coronary artery. As a result, that blood vessel had only 30% of its normal capacity. When the insured engaged in the strenuous activity on the night of his death, this blockage caused the heart attack which killed him. At the trial, the pathologist and cardiologist called as expert witnesses by the plaintiff referred consistently to Watkins' condition as "heart disease" and referred particularly to his atherosclerotic condition as "severe". It is our opinion that the definition of "disease" as set forth by this Court in Dickerson, supra, and as quoted earlier in this opinion, is clearly met by the facts of this case.

2. *Did Watkins' heart disease "cause or contribute to" his death?* During the cross-examination of the pathologist called by the plaintiff to testify, counsel for both sides stipulated that, but for Watkins' heart condition, the heart attack would not have occurred. Further, during the questioning of the cardiologist called as an expert witness by the plaintiff, the witness stated that the cause of Watkins' death was due completely to heart disease. Watkins' heart disease clearly "caused or contributed to" his death.

From the above, we conclude that Watkins' death was "directly or indirectly caused or contributed to by * * * disease or natural causes", and was therefore excluded from the coverage of the policy. The evidence presented at the trial was undisputed; hence, there was no question of fact for the jury and the trial court was eminently correct in granting the directed verdict.

Our primary emphasis in this opinion has been as to the application of the "disease and natural causes" exclusion in the policy, for the reason that the trial court relied on that clause in holding that Watkins' death was excluded from coverage under the policy. Inasmuch as we have agreed with the conclusion of the trial court, we find it unnecessary to decide the issue of whether Watkins' death was one "resulting from an *accident*."

For the reasons advanced above, the judgment of the trial court is affirmed.

STRUCKMEYER, C. J., and HAYS, Vice C. J., and LOCKWOOD, J., concur.

NOTE: Justice JAMES DUKE CAMERON did not participate in the determination of this matter.