Argued September 25; affirmed December 16, 1941

## CHALFANT *v.* ARENS ET AL.

(120 P. (2d) 219)

Before KELLY, Chief Justice, and BAILEY, LUSK, RAND and BRAND, Associate Justices.

*Mark V. Weatherford*, of Albany (Weatherford & Thompson, of Albany, on the brief), for appellant.

*C. L. Marsters*, Assistant Attorney General (I. H. Van Winkle, Attorney General, and Oliver Crowther and C. S. Emmons, Assistant Attorneys General, on the brief), for respondents.

The plaintiff by way of appeal from an adverse ruling of the State Industrial Accident Commission filed a complaint in the circuit court alleging that he had "suffered an accidental injury arising out of and in the course of his said employment between the 20th and 24th day of August, 1940." Upon the trial the plaintiff introduced his evidence, rested, and upon motion of the defendant, the court entered a judgment of involuntary nonsuit. Plaintiff appeals.

BRAND, J. A single issue is presented for consideration: Did the plaintiff sustain a personal injury by accident arising out of and in the course of his employment caused by violent or external means? We must determine whether or not there was sufficient

evidence to go to the jury upon that issue. The plaintiff had been regularly employed in a sawmill, his usual work being that of an off-bearer. But from August 21, 1940, to and including August 24th he was engaged in firing the boiler at the mill. He testified that he had done that kind of work before and had "fired several days out there before that" on other occasions. He later testified that he had previously fired the boiler a half a day only. He testified that prior to August 21 he had normal vision and good health. In firing the boiler it was necessary for the plaintiff to open the firebox door which was about three feet off the ground and about two feet square. The firebox to the donkey stationary boiler was large and would accommodate a little better than a four-foot stick. It was the duty of the fireman to throw slab wood into the firebox every five or ten minutes, and in placing the wood properly in the firebox it was necessary to look in through the door. It was sometimes necessary to use irons or sticks in properly placing the fuel in the firebox. When the door is first opened the fire "is a kind of a dark red when you first put it on, because the draft comes up underneath, and when the door is opened it gets that much more draft and that throws a light light in there." The plaintiff testified:

"A. Well, the first day when I was firing the boiler I would look in there and put the wood in there, why, there was a scum come forming over my eyes, and so after I would get the fire in and close the door I would take my fingers and wipe it off like that. (indicating). Like you would if you had sweat in your eyes, and that continued every day those four days I fired the boiler."

His eyes ached. He noticed that they began "to kind of blur over me, and kind of get weak." These

conditions continued and got worse until he quit work at 4 p. m. on August the 24th. Speaking of the afternoon of August 24th, the plaintiff testified:

"A. Well, they didn't feel very good. They felt worse.

Q. And your vision?

A. And the vision begun to get shorter.

Q. Well, just tell the jury when you left there about four o'clock Saturday, that would be the 24th, would it?

A. Yes, sir.

Q. How your eyes—whether or not you could see at all?

A. My eyes, I could see pretty good, but my eyes they hurt, and so we went—I went home and changed clothes and we went to town in Corvallis, and we went to a show. We came out of the show about eleven o'clock and went down to the service stand there, the rest room, and while in there my eyesight went clear out on me.

Q. Now, what was the sensation the instant it went out?

A. Well, I was in there washing my hands, and so I just couldn't see anything, so up over head there is a dome light up there, and I turned around there and couldn't see, so I just looked up there and to see if I could see any light and I couldn't see it, and so I went on—I turned around and got to the door and my wife was standing out waiting for me and I called her and she came over and I told her I lost my eyesight, and she taken me up to where the car was and my stepson, he driven the car home.

Q. Did you drive the car in that day?

A. Yes, sir.

Q. Did it bother you at that time to see the road? Did you have any deficiency to the extent whether you were competent to drive it or not?

A. I couldn't see so very good when I drove the car in that evening."

Plaintiff testified that after 11 o'clock of August 24th he could see his wife, could see a paper up close at a distance of about three or four inches, but could not read. This condition continued up until about December 11 with no substantial improvement. On December 11 plaintiff had the flu, went to bed for four days, "and when I got up from the flu my eyesight began to come back."

"Q. Well, was it sudden or gradual?
A. Well, it was kind of sudden.
Q. Do you remember when you couldn't see and then when you could see?
A. Yes, sir.
Q. To tell when it was?
A. Well, it was after I got up out of bed, why, I got my clothes on and was out eating my breakfast and it all came to me."

The plaintiff testified that there had been gradual improvement of his eyes ever since December 11 but that his sight was still impaired. Upon cross-examination the following testimony was elicited:

"Q. And of course when you took this job you knew the nature of the work?
A. Yes, sir.
Q. And knew how you had to do it?
A. Yes, sir.
Q. And you did do it in the usual way that you had done it before?
A. Yes, sir.
Q. Mr. Chalfant, did you slip or fall at any time during that three and a half days or four days, whatever it was?
A. While I was firing?
Q. Yes.
A. No, sir, I did not.
Q. Did any stick or timber or anything strike you at all?
A. No, sir, it did not.

Q. Did any sudden flame of any kind shoot out of the box and burn your face?

A. No, sir, it did not.

Q. Did any cinders or anything like that fly out of the box and get in your eyes?

A. No, sir.

Q. There was nothing unusual happened at all at any time during the four days that you worked there?

A. No, sir.

Q. Now, I believe you testified here on direct examination that the first that you noticed was a scum over your eyes?

A. Yes.

Q. And that was like sweat?

A. Well, yes, in a way, just kind of a scum like.

Q. It was sweat, wasn't it?

A. Yes, it was really hot. I was sweating, but I don't believe it was the sweat running down my eyes. It was a sort of a scum come in my eyes."

Dr. O. R. Gullion, an eye specialist, examined the plaintiff on August 26, 1940. He found no diseased condition present. The doctor confirmed plaintiff's testimony as to limited vision. He testified that light can have an effect upon the eyes if strong enough and that effect is sometimes temporary, sometimes permanent. As to the effect of light the doctor testified:

"A. Well, sunlight, for instance, a very short exposure is sufficient to cause defect of vision which may be even permanent. Acetylene light has almost the same deleterious effect. When it comes to a fire that wood would make or something of that kind, I couldn't say. I don't think there is any record in any of the journals that I had describing the effect of a wood light.

＊　　　＊　　　＊　　　＊　　　＊

Q. Now, this man looked at a light which he described as a red bed of coals, dark red, that they were encased in the firebox of a donkey engine, and he would

open the door; then it would cause a draft to come through and it would be a bright light, and in doing his work every ten or fifteen minutes during the day he would look at that. Now, do you know from experience whether a light of that type could affect the eyes or not, from your experience?

A. No, I really do not know.

Q. You do not know?

A. No.

&ast; &ast; &ast; &ast; &ast;

A. Well, of course if there was any injury to the retina it was necessarily microscopic. It wasn't what we call macroscopic. That is, I couldn't detect it with my ophthalmoscope. I supposed that that was the situation.

Q. That was the diagnosis you made then?

A. Yes, sir.

Q. And that was your best judgment?

A. Yes, sir.''

On cross-examination the witness testified as follows:

''Q. Doctor, as a result of your examination and what you have found in this plaintiff are you of the opinion that he did go blind from looking at that wood fire?

A. Well, I don't know what he went blind from. I couldn't say.

The Court: Q. From your examination were you satisfied that he had gone blind or practically so?

A. Well, when a person complains of being blind in both eyes, I couldn't check it very much, whether he was actually blind or not.''

Upon the first examination the doctor found that the plaintiff had a slight conjunctivitis, that is, an inflammation of the inside of the lid, which however did not affect his vision, but which might have caused

some blurring. The doctor's principal examination was ophthalmoscopic for the purpose of observing the cornea, the iris, the lens, the retina and the optic nerve. He testified that he found no pathology present, that as far as he could see from the examination the eye was normal and that he was unable to find any evidence of trauma.

■ The foregoing is a fair summary of the testimony most favorable to the plaintiff. If we are to avoid a judgment of nonsuit it is necessary to find in the transcript substantial evidence of a personal injury by accident which must have arisen out of and in the course of plaintiff's employment and which must have been caused by violent or external means. 7 O. C. L. A. § 102-1754.

The rule in this state has been definitely established. The authorities have been frequently reviewed. Cases from other states have been distinguished by reference to the statutes which differ from our own. We need only to apply the Oregon rule to the facts in the case at bar.

■ The only physician who testified did not know whether a light of the type in question could affect the eyes or not. But assuming that there is evidence of a causal connection between plaintiff's conduct in looking from time to time at the wood fire and the impairment of his eyesight, still it follows that the unexpected result to his eyes occurred by reason of the doing by the plaintiff of intentional acts in which no mischance, slip or mishap occurred. The injury was unusual and unexpected but it was not caused by accidental means. The plaintiff was engaged in firing a boiler and he deliberately looked at the fire as he threw in the wood.

"That is what he intended to do and that is what he did."

"In determining whether this conclusion was proper, we must bear in mind that this court is committed to the line of cases which hold that where an unusual or unexpected result occurs by reason of the doing by insured of an intentional act, where no mischance, slip or mishap occurs in doing the act itself, the ensuing injury or death is not caused through accidental means; that it must appear that the means used was accidental, and it is not enough that the result may be unusual, unexpected or unforeseen." *Demagalski v. State Ind. Acc. Comm.* 151 Or. 251, 254, 47 P. (2d) 947 (1935). See also *Iwanicki v. State Ind. Acc. Comm.* 104 Or. 650, 205 P. 990, 29 A. L. R. 682 (1922); *Dondeneau v. State Ind. Acc. Comm.* 119 Or. 357, 249 P. 820, 50 A. L. R. 1129 (1926); *Ryan v. State Ind. Acc. Comm.* 154 Or. 563, 61 P. (2d) 426 (1936); *Ramsey v. State Ind. Acc. Comm.* 159 Or. 43, 77 P. (2d) 1109 (1938).

Plaintiff relies upon the case of *Banister v. State Ind. Acc. Comm.*, 142 Or. 97, 19 P. (2d) 403 (1933), in which it was held that one who suffered injury by coming in contact with poison oak brush was entitled to compensation under the act. That case is not inconsistent with the Oregon cases cited supra. The claimant's contact with the poison oak happened by chance. He was in ignorance of its character and the contact was involuntary and unintentional.

The plaintiff also cites cases from New York, Colorado, Oklahoma, Ohio and Illinois. Several of these cases awarded compensation where the employee unintentionally breathed monoxide gas resulting in his death. Many such cases might no doubt be deemed compensable under the Oregon statute, but in every case cited by plaintiff the statute differed materially

from the provisions of the Oregon code. The New York, Oklahoma and Illinois statutes employ the term "accidental injury" while the Ohio statute does not employ the word "accident" or "accidental" at all. As stated in 5 Couch, Cyclopedia of Insurance Law, p. 3972, § 1137:

"* * * As a matter of fact, many cases draw a distinction between accidental injury or death, and injury or death by accidental means; that is, between 'accident' and 'accidental means.' A distinction between accidental death and death resulting from accidental means is that, in the former, death is accidental if the result is an accident, whether due to accidental means or not, whereas, in the latter, regardless of whether the means by which death is produced be voluntarily employed, the result is due to accidental means if in the act preceding the injury something unforeseen, unusual, and unexpected occurs which produces the result; death caused by accidental means is an accidental death, but an accidental death may or may not be the result of accidental means."

■ The Oregon statute upon inspection indicates that something must occur in the nature of an accident other than the mere physical injury which is obviously the result. If an injury is said to occur by specified "means" the attention is immediately directed to the events preceding the occurrence. An employment of the word "means" suggests the cause or circumstance producing the specified result. When it is added that the "means" must be "violent or external" the same inference is fortified.

Another circumstance militates against the contention of the plaintiff that he suffered an "accident." Even where the statute employs the words "accidental injury" instead of injury caused by "external means" the word "accident" is commonly defined as meaning

a sudden and unexpected happening, the time and place of which can be definitely fixed.

"Throughout all these precedents we find it laid down that where the term 'accident,' especially when it is to be brought about by violent or external means, is employed, it denotes some sudden, unexpected happening which produces the hurtful result and must be referable to a certain time and place. The requirements of our Code that the claim shall be filed within a certain time after the date of the accident and that the employer must make immediate report of the happening of the accident, enforce this conclusion, that the injury must be referable to a certain point of time." *Iwanicki v. State Ind Acc. Comm.*, supra.

■ The following cases cited by the plaintiff, all of which are distinguishable from the case at bar, nevertheless support this doctrine that an accident is an event, the time of which can be definitely fixed: *Indian Territory Illuminating Oil Co. v. Stone*, 158 Okl. 262, 13 P. (2d) 579 (1932); *Indian Territory Illuminating Oil Co. v. Caviness*, 160 Okl. 110, 16 P. (2d) 132 (1932); *Cantor v. Elsmere Garage*, 214 App. Div. 351, 212 N. Y. Supp. 327 (1925).

In the case at bar the plaintiff introduced in evidence the workman's application for compensation in which the following appears over the signature of the plaintiff:

"Date on which accident occurred: Aug. 24th 1940. Hour of Day, 11 P. M. Place where accident occurred: Street No. 3rd & Monroe, City Corvallis County Benton."

■ Obviously the time specified at which the accident occurred is seven hours after the plaintiff ceased work and the place specified is Corvallis, a distance of some miles from the place of employment. We do not deem

this evidence conclusive against the plaintiff, but it does fortify our conclusion that in this case no reasonably definite time can be specified as of which any sudden accident occurred in the course of his employment.

The trial court correctly concluded that there was no sufficient evidence of an accident in this case, and the judgment of nonsuit was properly entered.

Reliance was also placed by the trial court upon a second ground for its judgment of nonsuit. In the application for rehearing the only claim asserted was for permanent total disability. The trial court cited 7 O. C. L. A. 102-1774, to the effect that upon appeal the plaintiff may raise only such issues of law and fact as were properly included in his application for rehearing. Since the court found no evidence of total and permanent disability it was thought that a nonsuit should be granted notwithstanding the existence of substantial evidence of partial and at least temporary disability.

■ We are of the opinion that the allegation of permanent and total disability, although improper, would nevertheless sufficiently authorize the court to receive evidence of a lesser degree of disability. In this latter ruling the court was in error.

There being no substantial evidence of compensable injury the judgment of the trial court is affirmed.