Argued January 28, affirmed March 9, 1972

POPE, *Respondent, v.* BENEFIT TRUST LIFE
INSURANCE COMPANY, *Appellant.*

494 P2d 420

*Frank H. Lagesen,* Portland, argued the cause for appellant. With him on the briefs were Maguire, Kester & Cosgrave and Walter J. Cosgrave, Portland.

*Keith Burns,* Portland, argued the cause for respondent. With him on the brief was Jane Edwards, Portland.

TONGUE, J.

This is an action to recover monthly disability benefits under a group accident and health insurance policy issued by defendant to the Union Pacific Rail-

road Employees Hospital Association to provide such benefits to Union Pacific employees for disability "as the result of bodily injury arising from accidental cause." Defendant appeals from a judgment awarding such recovery to plaintiff, after a trial before the court, without a jury.

Plaintiff's fingers were frostbitten, requiring amputation, as the result of exposure to cold while employed by the Union Pacific Railroad to keep switches clear of ice and snow during a period of extreme cold weather on December 30 and 31, 1968.

Defendant contends that the words "accidental cause" mean the same as "accidental means" and that this court is committed to the distinction between liability under such insurance policies for injuries by "accidental means" and non-liability for injuries which are the unexpected results "of the doing by the plaintiff of intentional acts in which no mischance, slip or mishap occurred," quoting from *Chalfant v. Arens et al,* 167 Or 649, 656, 120 P2d 219 (1941), and also citing *Finley v. Prudential Ins. Co.,* 236 Or 235, 246, 388 P2d 21 (1963). Thus, defendant contends that plaintiff's "exposure was not due to any mishap, slip, mischance or unexpected or unintended event" and that his injury "developed as a result of his intended and knowing exposure to the extreme cold and not by reason of 'accidental cause'," with the result that there is no right of recovery under the policy.

The distinction between injury by "accidental means" and "accidental results from intended means," although recognized by this court in *Chalfant v. Arens et al, supra,* and in *Finley v. Prudential Ins. Co., supra,* has been the subject of increasing criticism in

recent years.[1] The rationale of those decisions which reject such a distinction is, in essence, that the term "accidental means" must be given the meaning which the ordinary purchaser of a policy of insurance places upon that term when he buys a policy[2] (i.e., the reasonable expectation and purpose of the ordinary purchaser of such a policy),[3] "with the help of the established rule that ambiguities and uncertainties are to be resolved against the company,"[4] and that "the proposed distinction will not survive the application of that test."[5] Such a rationale is not inconsistent with

---

[1] According to Richards on Insurance 734, § 216 (5th ed 1952):

"This attempted distinction between 'accidental means' and 'accidental injury or death,' as a rationale for a decision in a given case, has not been followed by a majority of the courts today. Ever since Justice Cardozo's dissent in the Landress case (291 US 491, 78 L ed 934, 54 S Ct 461), bench and bar have demonstrated their distrusts for such logomachy."

At the least, an increasing number of jurisdictions have now rejected or repudiated that distinction. See 10 Couch on Insurance 2d 53, § 41.30 and cases cited therein. See also Vance on Insurance, 949, § 181 (3d ed 1951), and Annot., 166 ALR 469 (1947).

[2] Cf. Finley v. Prudential Ins. Co., 236 Or 235, 245, 388 P2d 21 (1963).

[3] See 166 ALR, *supra* note 1, at 475.

[4] See dissent by Cardozo, J., in Landress v. Phoenix Mut. L. Ins. Co., 291 US 491, 499, 78 L ed 934, 938, 54 S Ct 461, 464 (1934).

[5] Idem. As further stated by Cardozo, J.:

"When a man has died in such a way that his death is spoken of as an accident, he has died because of an accident, and hence by accidental means."

Among other recent cases to the same effect, see Beckman v. Travellers Insurance Company, 424 Pa 107, 225 A2d 532 (1967), and Knight v. Metropolitan Life Insurance Company, 103 Ariz 100, 437 P2d 416 (1968).

It is also contended that if the insurance company wishes that the terms "accident" and "accidental means" shall have different meanings the contract of insurance should give warning of that distinction and should expressly exclude specific types of non-covered risks. See 166 ALR, *supra note 1*, at 476 and 478.

the approach taken by this court in recent decisions involving the interpretation of insurance policies.[○]

Under the facts of this particular case, however, it is not necessary for this court to re-examine this distinction. This is because we find, after reading the entire record in this case, that there was sufficient evidence to support the decision of the trial court that plaintiff's injury resulted from an "accidental cause" because, under the particular facts of this case, it cannot properly be said that the injury to plaintiff's hands "occurred by reason of the doing by the plaintiff of intentional acts in which no mischance, slip or mishap occurred"—to apply the test contended for by the defendant in this case.[○]

■ Plaintiff was 64 years of age, with an eighth grade education. He had been employed by the Union Pacific for 19 years in "maintenance of way," including the keeping of switches in repair and operation. During previous winters he had also been assigned to keep switches clear of ice and snow.

Ordinarily, however, he would be taken to his work by rail on a "Sunshine motor car," after picking up

---

[○] Salisbury v. John Hancock Mut. Life, 259 Or 453, 486 P2d 1279 (1971). See also Gowans v. N.W. Pac. Indemnity Co., 93 Adv Sh 730, 731, — Or —, 489 P2d 947 (1971); Hardware Mut. Cas. v. Farmers Ins., 256 Or 599, 609, 474 P2d 316 (1970); Jarrard v. Continental Casualty, 250 Or 119, 126, 440 P2d 858 (1968); and Ramco, Inc. v. Pac. Ins., 249 Or 666, 674, 439 P2d 1002 (1968). In addition, see Finley v. Prudential Ins. Co., 236 Or 235, 249, 388 P2d 21 (1963), quoting with seeming approval from N.W. Commercial Travellers Association v. The London Guarantee and Accident Co., 10 Manitoba Reports 537.

[○] Under that test, as stated in Chalfant v. Arens et al, 167 Or 649, 120 P2d 219 (1941), at 657, an injury or death does not result from "accidental means" where "an unusual or unexpected result occurs by reason of the doing by the insured of an intentional act, where no mischance, slip, or mishap occurs in doing the act itself * * *."

tools at "Russell Street." These tools included an axe, among other tools. As a result, he was "ordinarily able to have some heat on the job" during periods of extreme cold weather by "cutting old ties and burning them."

In addition, the practice was that the foreman would come by in the middle of the shift and "if the weather is bad enough, they take you to the shack [nearly two miles away] where you can get warm."

There was also evidence that on some occasions the men would drive directly to the job site, rather than to "Russell Street," and that on such occasions "the first man" picked up the tools and "carried them down in his car." There was also evidence that on such occasions more than one employee would be assigned to such work and that one of them would bring his car to the area where the men might sit to eat lunch, with a car heater to get warm.

On December 30, 1968, however, none of these things occurred. Plaintiff was on vacation at that time and was called by his foreman to go to work. The foreman told him to dress warmly and he knew from the radio that "the temperature was going to be down to six above zero." Accordingly, he put on "lots of clothes," including rubber gloves with an inner lining. He had "worked that junction" (St. Johns junction) many times before. On this occasion, however, he was told by his foreman to go directly to St. Johns junction, rather than to go to "Russell Street" to pick up tools (including an axe) and to be transported to the junction on the "Sunshine motor car." Plaintiff intended to take his car (which he could have used to eat his lunch and get warm), but when he tried to get it "out" he was unable to do so, so arranged with a friend to drive him to work.

When he arrived at the junction on December 30, 1968, however, there was no axe on the job and the only tools there were a broom and a shovel. In addition, the only other man on the job then left, with his car. As a result, plaintiff was left to work alone.

Plaintiff's duties on that day were to keep four switches in a "two-block area" clear of snow and ice and he worked eight hours in doing so, from 4 o'clock p.m. until midnight. During that period "the wind was howling and it continued snowing." The temperature was between eight and 14 degrees above zero. The wind averaged 23 miles per hour, with gusts up to 30 miles per hour, and it snowed five inches that day.

There were some "old ties" available for the purpose of building a fire to keep warm, but he was unable to build such a fire because he had no axe with which to cut the ties to start such a fire, although he had expected to find an axe among the tools when he arrived. Plaintiff tried to start a fire with some fusees given to him by the crew of a passing train, but was unable to do so.

That night the foreman did not come by and take him to the "shack" at the Albina yard to get warm, as he usually did when "the weather was bad enough," as it was that night. As previously stated, since plaintiff had been unable to start his car and was working alone, he had no car to get into to get warm with a car heater.

Having no fire and no "shack" or car to get into, plaintiff also had no place to eat his lunch, for such warmth and energy as it might provide. As a result, he was exposed to the wind, snow and cold for the entire eight hours, working with a broom and shovel to keep the switches clear of ice and snow. During that

time, his hands became cold and he had no way to warm them except by putting them next to his body.

When plaintiff arrived home at 12:30 a.m. his hands were cold and he felt a "kind of sting a little bit on the ends." He put them into cold water and rubbed them until they "seemed to act normal" and he went to bed "around two o'clock." His hands were still cold, however, and he "couldn't get [them] warm."

At 5:15 a.m. plaintiff got up to go back to work. At 7:30 a.m. on December 31, 1968, his friend drove him back to work. Two other men were also assigned to work with him for most of that day. They also had axes that day and were able to start small fires, which gave "not very much" heat and kept going out. They had their cars, however, so that they were able to eat their lunches in the cars.

As a result, plaintiff was able to warm his hands with the car heater. During that day, however, his hands began "to sting on the ends" again. They also "swelled up" several times and "turned kind of gray-ish-like."

He did not work the next day. The following day he went to a doctor, who sent him to a hospital, where his fingers were amputated.

Based upon this evidence the trial court concluded that plaintiff's injuries "arose from accidental cause within the meaning of his contract of insurance with defendant." We agree.

This is not a case of an unexpected result which "occurred by reason of the doing by the plaintiff of intentional acts in which no mischance, slip or mishap occurred," as in *Chalfant v. Arens et al, supra.* On the contrary, the absence of the expected axe with which a warming fire could have been made, the

failure of the foreman to take plaintiff to a warming shack as was usually done in bad weather, and the absence of a car with a heater for lunch were all unexpected "mischances" or "slips," if not "mishaps." They were also "unexpected" and "unintended events" which contributed as concurring causes to the freezing of plaintiff's hands.

As a result, it is our opinion that under the facts of this case the trial court was correct in holding that plaintiff's injury was a "bodily injury arising from accidental cause."[®] After all, in *Finley v. Prudential Ins. Co., supra,* in which this court recognized the distinction between "accidental means" and "accidental results from intended means," we nevertheless held (at p 245) that:

"* * * It is our duty to place upon the word 'accident' its common meaning—the meaning which a purchaser of a policy of accident insurance places upon that word when he buys a policy."

Defendant also contends that plaintiff is barred from recovery because of what are claimed to be "judicial admissions" made on deposition, as follows:

"Q. Were the conditions out there in any way different from what you expected to find?
"A. No.

"Q. While you were working, did anything unusual or unexpected occur out there?
"A. No."

This is not a case such as *Morey, Administrator v. Redifer et al,* 204 Or 194, 264 P2d 418, 282 P2d 1062 (1955), as relied upon by defendant.

---

[®] For somewhat similar cases involving liability under accident insurance policies for exposure to cold, see Annot., 4 ALR3d 1178 (1965).

■ The rule as stated in that case (at p 214) is as follows:

"\* \* \* When a party to an action or suit stipulates or testifies deliberately to a concrete fact, not as a matter of opinion, estimate, appearance, inference, or uncertain memory, but as a considered circumstance of the case, his adversary is entitled to hold him to it as a judicial admission. If no mistake is claimed or shown, the party so stipulating or testifying to a concrete fact cannot have the benefit of other evidence tending to falsify it."

In this case, the trial judge could have properly found that plaintiff, who was 64 years of age, with an eighth grade education, understood from the question that the reference to "conditions" had reference to weather conditions, not to the unexpected absence of the axe, warming "shack" and car with heater. This is supported by the fact that when first asked if *"conditions"* were different from what he expected to find, plaintiff answered, "I thought maybe it would cease."

Similarly, the trial judge could have reasonably found that when asked: "Did anything unusual or unexpected *occur* out there?" plaintiff understood the question to refer to *affirmative occurrences,* rather than to the unexpected *absence* of the axe, warming "shack" or car with heater, which were not "occurrences" in that sense.

■ Accordingly, the trial judge could have properly found that these answers by plaintiff to these questions on deposition did not constitute "deliberate testimony to a concrete fact" as a "considered circumstance of the case," and without mistake or misunderstanding, within the meaning of *Morey, Administrator v. Redifer, supra.* Indeed, the record on appeal does

not reveal whether or not at the time of trial defendant claimed these answers to be binding as judicial admissions, so as to call upon plaintiff to claim mistake or misunderstanding at that time.

■ Finally, defendant contends that plaintiff admitted that he had access to a telephone and could have called for assistance. From his testimony, however, the trial judge could have properly found that it was plaintiff's understanding that the telephone was only to be used in the event of an emergency and, in addition, that he did not realize that his hands were being frozen until too late.

For all of these reasons, we affirm the judgment of the trial court.

O'CONNELL, C. J., Specially Concurring.

I reach the same result as the majority but by different reasoning.

The majority opinion, following the previously adopted distinction between accidental means (cause) and accidental result (effect), finds that the means producing the injury were accidental.

Assuming that the distinction provides a workable basis for classifying those injuries which are covered under accident insurance policies and those that are not, I do not think that we have any basis for deciding whether the events leading up to the injury in this case were "accidental."

The majority arrives at its conclusion by first defining "accidental" in terms of the unexpectedness of the occurrence producing the injury. This does not advance the analysis of the problem because it attempts to define the word "accidental" by reference to another word (unexpectedness) which is at the

same level of abstraction. I doubt that all unexpected occurrences from which an injury flows would be commonly understood as "accidental." I cannot prove that this is so because there is no empirical data indicating how the term "accidental" is used and understood in common parlance.

The adjudicated cases demonstrate that the courts, at least, do not agree on what is embraced within the "accidental" category. The confusion springs in large part from the differences in opinion as to what constitutes an "unexpected" event or occurrence. Whether an event leading up to an injury is to be regarded as unexpected or expected will depend upon the frequency with which events of that kind commonly occur in similar situations. If the event is reasonably foreseeable, it is not an accidental event that the injury ensuing is not an injury by accidental means, adopting the formula allowing recovery only if the cause is accidental.

In the present case the unexpected events relied upon by the majority are the absence of the axe, the failure of the foreman to take plaintiff to a warming shack, and the absence of a car with a heater during lunchtime. All these, it may be conceded, were unexpected events, but the question is whether they are the type of unexpected events which would characterize them as accidental according to the common understanding of that term. Personally, I do not know what that understanding might be. It does not strike me as unusual that the axe and the car with a heater were not at the work site, or that plaintiff's transportation was delayed. It would seem that if these events were "accidental means," then almost any circumstance can be transformed into an accident within the meaning of an accident insurance policy.

Thus, I would assume that the court would hold that if the insured suffered a frostbite injury because the temperature dropped below that which he anticipated, or if he failed to dress warmly enough, or was exposed to the cold for a longer period than anticipated the injury would result from accidental means.

I do not say that the injury suffered by plaintiff was not accidental; I simply say that I do not know and I do not think that the majority of the court stands in any better position.

I concur in the result on the ground that when an insurance contract contains an ambiguous term which we have no way of resolving, the insurance contract is to be construed against the insurer.

I would add that I do not think that the distinction between accidental means and accidental results is workable and, therefore, I feel that we should abolish it. See the dissent by Cardozo, J., in *Landress v. Phoenix Mut. L. Ins. Co.*, 291 US 491, 54 S Ct 461, 464, 78 L Ed 934, 938 (1934); Note, Insurance-Accidental Means v. Accidental Death, or Tweedledum v. Tweedledee, 46 N C L Rev 178 (1967); Note, 36 Ind L J 376 (1961). I recognize that even though the distinction is abolished the problem of drawing the line between injuries that are accidental and those that are not still remains. But unless insurers word their policies more clearly they will have to bear the burdens arising from their own ambiguities. Ultimately, of course, these burdens will be shifted to the purchasers of insurance in the form of higher premiums.

HOLMAN, J., concurs in this opinion.